# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| BRIAN HARPOLE, *et al.*, | § § | |
| *Plaintiff*, | § § | |
| v. | § § | Case No.: 3:26-cv-00556 |
| CANDACE OWENS, *et al.*, | § § | |
| *Defendants*. | § § § | |

## OWENS DEFENDANTS' (1) PARTIAL MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR FAILURE TO STATE A CLAIM; (2) TENNESSEE PUBLIC PARTICIPATION ACT PETITION TO DISMISS PLAINTIFF'S COMPLAINT; AND (3) PARTIAL MOTION TO STRIKE AND INCORPORATED MEMORANDUM OF LAW

## I.  INTRODUCTION

When Charlie Kirk was assassinated on September 10, 2025, Plaintiff Brian Harpole was the head of the security firm responsible for protecting him. That undisputed fact provides the "'obvious alternative explanation'" for the loss in professional standing Plaintiff claims to have suffered. *See Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 567 (2007)). Yet Plaintiff blames Candace Owens instead.

Ms. Owens is a commentator, podcaster, and social-media figure who commented on the security failures that enabled Kirk's murder. Ms. Owens presented her opinions on a matter of intense public interest and offered her assessment that Plaintiff performed his security duties poorly. Based on Ms. Owens's podcast commentary about Kirk's assassination, Plaintiff sues Candace Owens, Candace Owens LLC, and GeorgeTom, Inc. (collectively, the "Owens Defendants") for defamation, false light, civil conspiracy, and aiding-and-abetting.

Seven independent defects require dismissing Plaintiff's claims against the Owens

Defendants, either in whole or in part. *First*, the challenged statements are inactionable opinions, rhetorical hyperbole, and questions incapable of a defamatory meaning. *Second*, Plaintiff is a limited-purpose public figure who must prove actual malice, yet he pleads negligence and does not plausibly allege facts supporting actual malice. *Third*, Plaintiff fails to plausibly allege causally connected damages—and the most obvious explanation for Plaintiff's reputational harm is that the person Plaintiff was hired to protect was assassinated on his watch. *Fourth*, Plaintiff's false light claim is redundant of his defamation claims and should be stricken. *Fifth*, Plaintiff's civil conspiracy and aiding-and-abetting claims fail because they are specific-intent torts incompatible with the negligence theory Plaintiff pleads, and they rest on fatally conclusory assertions beyond that. *Sixth*, the Tennessee Public Participation Act ("TPPA") independently requires dismissal of Plaintiff's claims. *Seventh*, Plaintiff seeks unconstitutional injunctive relief. The Owens Defendants thus request that this Court dismiss Plaintiff's claims against them and award them fees, costs, and expenses under the TPPA.

## II. LEGAL STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face[,]" and it must raise more than a "possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quotation omitted); *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[A] legal conclusion couched as a factual allegation need not be accepted as true . . . , nor are recitations of the elements of a cause of action sufficient." *Fritz v.*

*Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quotation omitted).

"[W]hen a complaint fails to allege a necessary element of the claim, it must be dismissed." *Snyder v. United States*, 590 F. App'x 505, 510 (6th Cir. 2014). Further, when adjudicating a Rule 12(b)(6) motion, a court "may consider . . . exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

"[T]he Supreme Court of the United States has constitutionalized the law of libel[.]" *Press, Inc. v. Verran*, 569 S.W.2d 435, 440 (Tenn. 1978); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). Thus, "ensuring that defamation actions proceed only upon statements which may actually defame a plaintiff is an essential gatekeeping function of the court." *Pendleton v. Newsome*, 772 S.E.2d 759, 763 (Va. 2015) (quotation omitted). Whether a communication is capable of a defamatory meaning is a question of law, and "[i]f the [allegedly defamatory] words are not reasonably capable of the meaning the plaintiff ascribes to them, the court must disregard the latter interpretation." *Moman v. M.M. Corp.*, No. 02A01-9608-CV00182, 1997 WL 167210, at \*3 (Tenn. Ct. App. Apr. 10, 1997) (citing *Stones River Motors, Inc. v. Mid-South Publ'g Co.*, 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983), *abrogation on other grounds recognized by Hill v. State,* No. M2022-01749-COA-R3-CV, 2025 WL 1078167 (Tenn. Ct. App. Apr. 10, 2025)); *see also Brown v. Mapco Express, Inc.*, 393 S.W.3d 696, 708–09 (Tenn. Ct. App. 2012). Each statement "'should be read as a person of ordinary intelligence would understand [it] in light of the surrounding circumstances.'" *Aegis Scis. Corp. v. Zelenik*, No. M2012-00898-COA-R3CV, 2013 WL 175807, at \*6 (Tenn. Ct. App. Jan. 16, 2013) (quoting *Revis v. McClean*, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000)). Statements also must be considered *in context*; "[a]ll parts of a published article should be construed as a whole." *Evans v. Nashville Banner Pub. Co.*, No. 87-

- 3 -

164-II, 1988 WL 105718, at *5 (Tenn. Ct. App. Oct. 12, 1988).

"[T]he plausibility pleading standard applies to the actual malice standard in defamation proceedings." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016). "Indeed, after *Iqbal* and *Twombly*, every circuit that has considered the matter has applied the *Iqbal/Twombly* standard and held that a defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice." *Id.*

The TPPA permits a party sued "in response to [its] exercise of the right of free speech" to "petition the court to dismiss the legal action." Tenn. Code Ann. § 20-17-104(a). The petitioning party must first make a "prima facie case" that a plaintiff's claim relates to the petitioner's exercise of First Amendment-protected rights. § 20-17-105(a). The burden then shifts to the plaintiff to "establish[] a prima facie case for each essential element of the claim[.]" § 20-17-105(b). Even then, "the court shall dismiss the legal action if the petitioning party establishes a valid defense to the claims[.]" § 20-17-105(c).

The TPPA's application to lawsuits filed in federal court is an unsettled question in the Sixth Circuit. Early district court decisions holding the TPPA inapplicable in federal court reasoned that the TPPA's "procedural nature poses an obstacle to simply importing the TPPA in its unvarnished entirety into a case filed in federal court." *Mucerino v. Martin*, No. 3:21-CV-00284, 2021 WL 5585637, at *6 (M.D. Tenn. Nov. 30, 2021); *see also Hughes v. Gupta*, 613 F. Supp. 3d 1054, 1056–58 (W.D. Tenn. 2021) (describing circuit split). As other federal courts have observed since, though, whether a state's anti-SLAPP statute must be imported "in its unvarnished entirety[,]" *see id.*, "is not the pertinent question[,]" *Paucek v. Shaulis*, 349 F.R.D. 498, 512 (D.N.J. 2025). Instead, "[t]he correct question is 'whether a particular state's anti-SLAPP law['s] unique text and structure' conflicts with the Federal Rules." *Id.* (cleaned up). And when making that

determination, the TPPA's "specific requirements . . . must be analyzed individually[.]" *Reed v. Chamblee*, No. 8:23-cv-1741, 2024 WL 69570, at *6 (M.D. Fla. Jan. 5, 2024).

Early federal authority holding that the TPPA does not apply in federal court also predates Tennessee jurisprudence clarifying that "the TPPA's prima facie case requirement is analogous to the evidentiary requirements in Rules 50.01 and 56 of the Tennessee Rules of Civil Procedure[,]" *SmileDirectClub, Inc. v. NBCUniversal Media, LLC*, 708 S.W.3d 556, 572 (Tenn. Ct. App. 2024), which are identical to Federal Rule of Civil Procedure 56, *see Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 261 (Tenn. 2015). Thus, there is no actual conflict between the TPPA, as clarified, and Rule 56; their respective procedural standards are *the same*. *See id.* Further, when—as here—a plaintiff's complaint fails even to state a claim, nothing prevents the TPPA and Federal Rule of Civil Procedure 12 from being "harmonized" by applying Rule 12 standards. *Reiss v. Rock Creek Constr., Inc.*, No. E2021-01513-COA-R3-CV, 2022 WL 16559447, at *7 (Tenn. Ct. App. Nov. 1, 2022). Thus, the TPPA's dismissal provision and fee-shifting provisions may apply here, even if some of the TPPA's other provisions do not.[1]

### III. ALLEGED FACTS

Plaintiff Brian Harpole is the founder and head of Integrity Security Solutions, a private security company that provided protective services for Charlie Kirk and Turning Point USA from 2022 to 2025. (Compl., Doc. 1, at ¶ 4.) Plaintiff sues on his own behalf—and purports to sue on

---

[1] To be sure, *some* provisions of the TPPA—like its statutory discovery stay and interlocutory appeal provision—conflict with federal procedural rules. But its *dismissal and fee-shifting provisions* do not. *See Paucek*, 349 F.R.D. at 505 ("This Opinion addresses an unanswered and important threshold question: does New Jersey's anti-SLAPP statute apply in federal court? The Court holds that while some provisions of the statute conflict with the Federal Rules of Civil Procedure, the statute's fee-shifting provision—awarding fees, costs, and expenses to a defendant who prevails under Federal Rule 12 or Federal Rule 56—does not.").

behalf of non-party "Integrity Solutions"—seeking damages exceeding $75,000. (*Id.*)

Defendant Candace Owens is a commentator, podcaster, and social-media figure; the other Owens Defendants are her affiliated entities. (*Id.* at ¶¶ 5–7.) In Plaintiff's telling, Ms. Owens's "work primarily consists of commentary, interviews, and opinion-driven content[,]" and she "is nothing more than an entertainer[.]" (*Id.* at ¶ 17.)

On September 10, 2025, Charlie Kirk was shot and killed while speaking at Utah Valley University. (*Id.* at ¶ 20.) "On the day of the assassination, Harpole and his company Integrity Solutions were responsible for providing security for Charlie Kirk." (*Id.* at ¶ 21.) The assassination drew widespread national commentary, including conspiracy theories advanced by "commentators" of every stripe. (*Id.* at ¶ 22.)

Plaintiff did not remain on the sidelines of the controversy. Instead, Plaintiff entered that controversy himself, on huge national platforms, and on his own terms. On November 17, 2025—*before Ms. Owens ever mentioned his name*[2]—Plaintiff appeared on the Shawn Ryan Show, one of the most widely viewed podcasts in the country. (*Id.* at ¶ 28.) Plaintiff stated that what "drove [him] to come" was that: (1) the public treatment of the assassination had become "sickening[,]" **Ex. 6**, Shawn Ryan Show Ep. 254 (Nov. 17, 2025), at 2:20–24, and (2) he was "representing" his team, *id.* at 3:8–21. During the appearance, Plaintiff gave his own account of the security operation and blamed the university police chief for leaving the rooftop unsecured. *Id*. at 43–44. Plaintiff also asked the public to act on the controversy, urging: "Do a FOIA for the communications for days leading up to it. Do it. And the truth is like a lion. If you set it free, it will fight for itself." *Id.*

---

[2] Ms. Owens did not identify Plaintiff until after he appeared on Shawn Ryan's podcast. Her episodes of October 27, November 10, and November 13 never mention him, *see* **Ex. 1**, Candace Ep. 252 (Oct. 27, 2025); **Ex. 2**, Candace Ep. 262 (Nov. 10, 2025); **Ex. 3**, Candace Ep. 264 (Nov. 13, 2025). She first named him on November 18, 2025, by reference to "an interview that he did with Shawn Ryan." **Ex. 4**, Candace Ep. 267 (Nov. 18, 2025), at 19:11–12.

at 46:11–13. At no point did Plaintiff mention Ms. Owens. *See generally id.*

On November 25, 2025, Plaintiff gave a second national interview to Gary Melton.[3] (Compl. ¶ 28); *see also* **Ex. 7**, Gary Melton Interview (Nov. 25, 2025). Notably, when the host raised Ms. Owens and asked for a "response to her[,]" Plaintiff declined to engage, instead using his appearance to speak to broader themes. *Id.* at 105–06.

Ms. Owens's October 27, November 10, and November 13, 2025, podcast episodes addressed Mr. Kirk's assassination and security arrangements but did not name Plaintiff. *See* **Ex. 1**, Candace Ep. 252 (Oct. 27, 2025); **Ex. 2**, Candace Ep. 262 (Nov. 10, 2025); **Ex. 3**, Candace Ep. 264 (Nov. 13, 2025). Ms. Owens first identified Plaintiff on November 18, 2025, specifically referencing "an interview that he did with Shawn Ryan." **Ex. 4**, Candace Ep. 267 (Nov. 18, 2025), at 19:11–12. Ms. Owens also contacted Plaintiff directly and offered him the opportunity to discuss the matter beforehand, but Plaintiff did not respond. (Compl. ¶ 54.)

The statements challenged in this Motion are Ms. Owens's commentary that the security team left Mr. Kirk a "sitting duck" (*id.* at ¶ 26); **Ex. 2**, Candace Ep. 262 (Nov. 10, 2025), at 28:1–18; that the team's post-shooting releveling of the ground was "shady" (Compl. ¶ 27); **Ex. 3**, Candace Ep. 264 (Nov. 13, 2025), at 44:25–45:4; that Plaintiff carried a bag that was "supposed to be" a medical bag (Compl. ¶ 30); **Ex. 4**, Candace Ep. 267 (Nov. 18, 2025), at 19:20–22; that, after asking a police chief an "'either or' question" about rooftop access and failing to follow up in any format after receiving the answer "got you covered," Plaintiff "should be fired" (Compl. ¶ 31); *see also* **Ex. 4**, Candace Ep. 267 (Nov. 18, 2025), at 21:7–23:1; her question, "[i]s this how these assassinations happen?" (Compl. ¶ 30); **Ex. 4**, Candace Ep. 267 (Nov. 18, 2025), at 24:17–18; her statement that Plaintiff's interview "misrepresented the availability of drones" and was

---

[3] The Complaint refers to Mr. Melton incorrectly as "Gary Milton." *See* Compl. ¶ 28.

"dishonest" (Compl. ¶¶ 32–33); *see also* **Ex. 4**, Candace Ep. 267 (Nov. 18, 2025), at 23:2–25:3 (opining that Plaintiff gave off a "vibe" of "dishonesty" regarding drone availability); two December posts on X (Compl. ¶¶ 45, 47); and her January 8, 2026, commentary on the absence of advance security coordination for a separate event Mr. Kirk was to attend at Charis Bible College in Colorado (Compl. ¶¶ 71–74); **Ex. 5**, Candace Ep. 287 (Jan. 8, 2026), at 4:23–6:9.[4] Before offering these opinions, Ms. Owens recited the facts on which she was commenting—often by playing Plaintiff's own recorded explanations—and then offered her conclusions. For example, regarding the "should be fired" comment, Ms. Owens first laid out the rooftop exchange, telling her audience that Plaintiff asked the police chief an "either-or question," that the chief answered "gotcha covered," and that the team did not follow up; only then did she conclude "[o]n the basis of that answer you should all be fired." **Ex. 4**, Candace Ep. 267 (Nov. 18, 2025), at 21:7–22:8. So too with the medical bag in the same episode; Ms. Owens told her audience that Plaintiff "is the one who then runs over to Charlie" after the shooting. *Id.* at 19:12–19. The Complaint then quotes Ms. Owens's conclusions while omitting the disclosed facts on which she based them.

### IV. ARGUMENT

**A.** **EACH CHALLENGED STATEMENT IS NON-ACTIONABLE OPINION, RHETORICAL HYPERBOLE, OR A QUESTION INCAPABLE OF DEFAMATORY MEANING.**

An allegedly defamatory statement "must be factually false in order to be actionable[.]" *Moman*, 1997 WL 167210, at \*4. Thus, "comments upon true and nondefamatory published facts are not actionable, even though [the comments] are stated in strong or abusive terms." *Davis v. Covenant Presbyterian Church of Nashville*, No. M2014-02400-COA-R9-CV, 2015 WL 5766685, at \*3 (Tenn. Ct. App. Sept. 30, 2015) (quotation omitted); *see also Weidlich v. Rung,* No. M2017-

---

[4] If they survive the Owens Defendants' TPPA Petition, Plaintiff's allegations concerning Fort Huachuca will be dealt with in a later motion for summary judgment.

00045-COA-R3-CV, 2017 WL 4862068, at *6 (Tenn. Ct. App. Oct. 26, 2017). The dispositive question is "whether the statement is objectively capable of proof or disproof[.]" *Moses v. Roland,* No. W2019-00902-COA-R3-CV, 2021 WL 1140273, at *11 (Tenn. Ct. App. Mar. 25, 2021) (quotation omitted). "[W]hen a statement is 'rhetorical hyperbole' rather than verifiable or disprovable fact, the statement is not capable of a defamatory meaning." *Id.* Thus, a "subjective, standardless statement that cannot be objectively verified" is not actionable. *Edelstein v. Gmoser,* No. 21-3292, 2022 WL 4372200, at *2 (6th Cir. Aug. 29, 2022). Further, "'where there is no false representation of fact, one may not recover . . . merely upon the expression of an opinion . . . based upon disclosed, nondefamatory facts, no matter how derogatory it may be.'" *Kersey v. Wilson,* No. M2005-02106-COA-R3-CV, 2006 WL 3952899, at *6 (Tenn. Ct. App. Dec. 29, 2006) (quoting *Windsor v. Tennessean,* 654 S.W.2d 680, 685 (Tenn. Ct. App. 1983)).

Two contextual principles govern here. <u>*First*</u>, a statement must be "construed as a whole" and in context. *Evans,* 1988 WL 105718, at *5. <u>*Second*</u>, opinions based on disclosed, non-defamatory facts are not actionable; an opinion is actionable only if it "may reasonably be understood to imply the existence of undisclosed defamatory facts justifying the opinion." *Revis,* 31 S.W.3d at 253. As detailed below, these standards preclude liability.

     1.     **<u>The "should be fired" commentary is opinion based on facts Ms. Owens disclosed.</u>**

Plaintiff alleges Ms. Owens defamed him by saying he "should be fired." (Compl. ¶¶ 30–31, 87(a), 102(c).) But Plaintiff's Complaint omits critical context the transcript supplies. On the cited episode, Ms. Owens laid out the factual predicates for her opinion: Plaintiff's team learned of an open rooftop, Plaintiff asked the police chief "an either-or question" about securing it, the chief answered "gotcha covered[,]" and the security team did not follow up. *See* **Ex. 4**, Candace Ep. 267 (Nov. 18, 2025), at 21:7–22:7. Only then, based on these facts, did Ms. Owens offer the

opinion that "you should all be fired." *Id.* at 22:8.

That is quintessential opinion commentary: It is a conclusion based on facts laid out for listeners who were left free to draw their own conclusions. *Croce v. Sanders*, 843 F. App'x 710, 716–17 (6th Cir. 2021). Whether someone should be fired for accepting a cursory assurance about a security vulnerability is a value judgment that is not "objectively capable of proof or disproof." *See Moses*, 2021 WL 1140273, at *11. No factfinder could determine as objective fact whether Plaintiff should be fired. *Cf. Edelstein*, 2022 WL 4372200, at *2. And because Ms. Owens disclosed the underlying facts on which her opinion was based, her "comments upon true and nondefamatory published facts are not actionable, even though [the comments] are stated in strong or abusive terms." *Covenant Presbyterian Church*, 2015 WL 5766685, at *3 (quotation omitted).

The factual predicate underlying Ms. Owens's opinion is also true, which is an independent defense. "Truth is an absolute defense" to libel, and Tennessee's substantial-truth doctrine asks only whether "the 'sting' (or injurious part) of the statement is true." *Sullivan v. Wilson Cnty.*, No. M2011-00217-COA-R3CV, 2012 WL 1868292, at *12 (Tenn. Ct. App. May 22, 2012) (quotation omitted); *Isbell v. Travis Elec. Co.*, No. M1999-00052-COA-R3-CV, 2000 WL 1817252, at *5 (Tenn. Ct. App. Dec. 13, 2000); *see also Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 516 (1991) (falsity law "overlooks minor inaccuracies and concentrates upon substantial truth"). The Complaint does not assert that Plaintiff followed up with the police chief after the "gotcha covered" exchange, **Ex. 4**, Candace Ep. 267 (Nov. 18, 2025), at 21:7–22:8. (*See generally* Compl.) Further, because the facts on which Ms. Owens commented are not alleged to be false—and because the sting of the statement is the uncontested fact that Plaintiff *failed to follow up on a known security vulnerability that enabled Kirk's assassination*—Ms. Owens's commentary is not actionable. *See Moman*, 1997 WL 167210, at *4.

**2.** **The "sitting duck" remark and the "assassinations happen" question are protected hyperbole and an inactionable question.**

Plaintiff sues Ms. Owens both for opining that "when you spend millions of dollars on security . . . they don't have you sitting like a sitting duck and forget to have an ambulance behind you" (Compl. ¶ 26) and for asking, "[i]s this how these assassinations happen?" (Compl. ¶ 30.) Neither statement is actionable.

The "sitting duck" remark is a figure of speech. Such "loose, figurative" language also "cannot be construed as [a] representation[] of fact." *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 284–86 (1974); *see also Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) (use of "blackmail" to characterize a negotiating position was "no more than rhetorical hyperbole"). The transcript confirms the matter: The phrase was used to contrast popular theories with how professional security operates "[i]n real life[.]" *See* **Ex. 2**, Candace Ep. 262 (Nov. 10, 2025), at 28:15–18.

The "[i]s this how these assassinations happen?" statement fails independently because it is a *question*, and a question—no matter how unflattering—"cannot be defamatory" because "questions are questions." *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1339 (D.C. Cir. 2015); *see also id.* at 1338 ("[A] question, 'however embarrassing or unpleasant to its subject, is not [an] accusation'" (quoting *Chapin v. Knight-Ridder, Inc.,* 993 F.2d 1087, 1094 (4th Cir. 1993))); *cf. Partington v. Bugliosi*, 56 F.3d 1147, 1157 (9th Cir. 1995) (a question mark signals "lack of definitive knowledge about the issue" and invites the listener "to consider the possibility of other justifications"). Considered in context, *see Evans*, 1988 WL 105718, at *5, the question was an *inquiry* about negligent security, posed by analogy to the Secret Service's acknowledged failures around the attempted assassination of then-candidate Donald Trump. *See* **Ex. 4**, Candace Ep. 267 (Nov. 18, 2025), at 24:18–20 ("Is that what's happening even like at the White House

level with the Thomas Crooks thing?"). And a question comparing one security lapse to another is not a provably false assertion of fact. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–21 (1990).

The "sitting duck" statement also was not "directed to or concerning" Plaintiff. *Stones River Motors, Inc.*, 651 S.W.2d at 717. A defamation plaintiff must prove "a false and defamatory statement *concerning another*"—the "colloquium" requirement "confines actionable defamation to statements made against an 'ascertained or ascertainable person, and that person must be the plaintiff.'" *Steele v. Ritz*, No. W2008-02125-COA-R3-CV, 2009 WL 4825183, at *3 (Tenn. Ct. App. Dec. 16, 2009) (cleaned up). Here, the Complaint concedes the statement did not name Plaintiff and instead referenced "the security team[.]" (Compl. ¶ 104.) A statement directed at a group, however, is "not actionable by discrete members of the group." *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 n.1 (2d Cir. 2001) ("'group libels' are not actionable by discrete members of the group"). Thus, Ms. Owens's generalized comment about how a well-funded security detail should operate—made without naming Plaintiff—cannot support a defamation claim personal to Plaintiff.

3. **The "shady" and "supposed to be a medical bag" remarks are non-verifiable opinion commentary.**

Plaintiff sues Ms. Owens for saying that releveling the ground after the shooting was "shady" (Compl. ¶ 27), and stating Plaintiff's bag was "'supposed to be' [a] medical bag" (*id.* at ¶ 30). But a term like "shady" (*id.* at ¶ 27) is a paradigmatic "subjective, standardless statement that cannot be objectively verified." *Edelstein*, 2022 WL 4372200, at *2. The transcript shows Ms. Owens framed it as her own impression while disclosing the underlying fact: "[W]e know they then put down pavers almost immediately and releveled that area. So I do find that to be quite shady. I don't know what . . . they were doing." **Ex. 3**, Candace Ep. 264 (Nov. 13, 2025), at 44:25–

45:4. Prefaced by qualifiers like "I do find that to be" and "I don't know what . . . they were doing" (*see id.*), the remark thus communicated an opinion—not a verifiable fact—and it was not "objectively capable of proof or disproof." *Moses*, 2021 WL 1140273, at \*11.

The "'supposed to be' [a] medical bag" remark is weaker still. (Compl. ¶ 30.) Ms. Owens told her audience that Plaintiff "is the one who then runs over to Charlie" after the shooting. **Ex. 4**, Candace Ep. 267 (Nov. 18, 2025), at 19:12–19. The Complaint confirms Ms. Owens stated "Harpole ran over to Kirk with Harpole's medical bag after he was shot[.]" (Compl. ¶ 112.) Plaintiff thus cannot plausibly allege defamation based on Ms. Owens's acknowledgment that Plaintiff ran to render aid to Kirk. Ms. Owens's observation that Plaintiff's bag was "supposed to be" a medical bag also was not false (indeed, it is literally true), and the Court is "not bound by" Plaintiff's unreasonable interpretations. *Brown*, 393 S.W.3d at 708–09.

**4.** **The "drone" commentary is opinion expressly drawn from Plaintiff's own disclosed explanation.**

Plaintiff alleges Ms. Owens falsely accused him of "lying about drone availability." (Compl. ¶¶ 87(a)–(b), 102(d); *see also id.* at ¶¶ 31–32, 102(c).) But the transcript contradicts this claim. The statement did *not* assert as fact that Plaintiff lied. Instead, Ms. Owens played her audience Plaintiff's own explanation—that he "spent thousands of dollars on drones" and "got the guys licenses" but could not lawfully fly in restricted Provo airspace under FAA rules. **Ex. 4**, Candace Ep. 267 (Nov. 18, 2025), at 23:18–21. Then Ms. Owens offered her opinion: "Nor do I find him to be convincing . . . . The vibe I'm getting from that interview is dishonesty." *Id.* at 25:2–3.

Finding someone "[un]convincing" and getting a "vibe" of "dishonesty[,]" *see id.*, is exactly the kind of "imprecise" and "'value-laden'" language that "signal[s] to the listener that the speaker is expressing a subjective point of view[,]" *Croce*, 843 F. App'x at 714 (citation omitted).

Here, having "'state[d] the facts on which [s]he base[d] [her] opinion . . . and then express[ed] a comment[,]'" Ms. Owens stated a protected opinion. *Id.* at 716 (quoting Restatement 2d of Torts § 566 (Am. L. Inst. 1977)).

That Ms. Owens played exactly what Plaintiff said—thus inviting listeners to disagree with her—confirms the point. A "vibe" of "dishonesty" drawn from a played-back interview is opinion based on disclosed facts, *cf. Covenant Presbyterian Church*, 2015 WL 5766685, at *3, and it is not "objectively capable of proof or disproof[,]" *Moses*, 2021 WL 1140273, at *11.

5.    **The Charis Bible College commentary is opinion drawn from a fact Plaintiff concedes.**

Plaintiff challenges Ms. Owens's January 8, 2026, commentary that (1) Plaintiff's team had coordinated security for Utah Valley University weeks in advance but "had absolutely no security plan" in place for a separate event Mr. Kirk was slated to attend the next day at Charis Bible College in Colorado, and (2) "[i]f you expected Charlie to make it to September 11th, you would have been communicating about what he was doing up at the Charis Bible College[,]" **Ex. 5**, Candace Ep. 287 (Jan. 8, 2026), at 5:8–6:9. (Compl. ¶¶ 71–74.) The premise of this commentary is a fact that Plaintiff concedes: He "did not coordinate with Charis Bible College nor the Woodland Police Department[.]" (Compl. ¶ 73.) The commentary is thus opinion built on an undisputed, disclosed fact. And "[a] writer's comments upon true and nondefamatory published facts are not actionable, even though [the comments] are stated in strong or abusive terms." *Covenant Presbyterian Church*, 2015 WL 5766685, at *3 (quotation omitted).

6.    **The two December X posts are an inactionable string of questions and a concededly true statement.**

Plaintiff challenges a December 12, 2025, X post: "Harpole has already been caught lying about what transpired on that day. Did he also lie about having placed a 911 call? Did no one from

their team call 911 after Charlie was shot?" (Compl. ¶¶ 45, 102(e).)

None of this post is actionable. The opening sentence—that Plaintiff "has already been caught lying"—is Ms. Owens's characterization of conduct she had already disclosed to her audience in preceding episodes: the drone explanation she found unconvincing, **Ex. 4**, Candace Ep. 267 (Nov. 18, 2025), at 23:8–25:3; the rooftop security exchange with the university police chief, *id.* at 21:7–23:1; and other matters. A characterization of disputed prior conduct as "lying," made against the backdrop of facts the speaker has laid out to support the conclusion, is a "subjective, standardless" assessment of veracity, not an independently verifiable assertion. *Edelstein*, 2022 WL 4372200, at *2. And "[a] writer's comments upon true and nondefamatory published facts are not actionable, even though [the comments] are stated in strong or abusive terms." *Covenant Presbyterian Church*, 2015 WL 5766685, at *3 (cleaned up).

The two sentences that follow are *questions*, and questions—no matter how unflattering—"cannot be defamatory." *Abbas*, 783 F.3d at 1339; *Partington*, 56 F.3d at 1157. A question asking whether Plaintiff or his team placed a 911 call is not a provably false assertion of fact.

The December 16 post asserting that Plaintiff was "Charlie Kirk's security officer that didn't do so much as pack his wound after he was shot" (Compl. ¶ 47) also fails. Plaintiff frames it as *implying* that he "intentionally let Kirk bleed out and die from his gunshot wound instead of rendering aid." *Id.* But this is an unpleaded theory of defamation by implication, and Plaintiff's framing is contradicted by his own concession that Ms. Owens stated "Harpole ran over to Kirk with Harpole's medical bag" (*id.* at ¶ 112). A statement said to imply Plaintiff rendered no aid to Mr. Kirk cannot be squared with Plaintiff's allegation that Ms. Owens repeatedly told her audience that he did. *See Brown*, 393 S.W.3d at 708–09.

### 7. Plaintiff's juxtaposition theory fails.

Plaintiff pleads that Ms. Owens's statements, when "juxtaposed" and "[t]aken together," imply "Harpole is professionally unfit and allowed a murder to happen on his watch[.]" (Compl. ¶¶ 106, 108.) This theory fails on multiple grounds.

*First*, Plaintiff has not pleaded defamation by implication, either adequately or at all. "Defamation by implication occurs when statements that are true are nevertheless actionable [because] they imply facts that are not true." *Grant v. Com. Appeal*, No. W2015-00208-COA-R3-CV, 2015 WL 5772524, at *12 (Tenn. Ct. App. Sept. 18, 2015); *accord Isbell*, 2000 WL 1817252, at *6. To plead such a claim, Plaintiff must identify a defendant's literally true statements and the specific false fact they imply. The Complaint does not do this. Instead, it gestures at an "impression" arising from the statements "taken together" (Compl. ¶¶ 106, 108), without identifying which statement Plaintiff claims is true but conveys defamatory implications.

*Second*, the theory's premise is contradicted by Plaintiff's own pleading. A properly pleaded defamation by implication claim is actionable only where the juxtaposition or omission "so distort[s] the truth" that the publication "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 420 (Tenn. 1978) (quotation omitted). Such a theory "must rely on more than a 'tortured and extreme' reading of select facts" and "must depend on 'a reasonable person's perception of the entirety of a publication and not merely on individual statements[.]'" *Turner v. Wells*, 198 F. Supp. 3d 1355, 1374 (S.D. Fla. 2016) (citations omitted), *aff'd*, 879 F.3d 1254 (11th Cir. 2018).

There was no distortion here. Plaintiff concedes Ms. Owens disclosed the underlying facts that Plaintiff "coordinated with local officials, planned security, and ran over to Kirk with a

medical bag after he was shot." (Compl. ¶ 113.) Those conceded facts—coordination, planning, and rendering aid—do not imply complicity in Mr. Kirk's assassination. It also is literally true that Plaintiff "allowed a murder to happen on his watch" (Compl. ¶ 108), which the Complaint admits. (*See id.* at ¶ 21 ("On the day of the assassination, Harpole and his company Integrity Solutions were responsible for providing security for Charlie Kirk.").)

**8.**     **Plaintiff's central theory—that Ms. Owens portrayed him as "professionally unfit"—is inactionable opinion.**

Plaintiff's defamation claims reduce to a single overriding characterization: that Ms. Owens portrayed him as "professionally unfit." (*See* Compl. ¶¶ 106–08, 112–13.) But the charge that a person performed unprofessionally is a subjective value judgment beyond the ambit of defamation law. Thus, Plaintiff's central theory of liability is inactionable.

The Sixth Circuit's decision in *Croce*, 843 F. App'x 710, controls. There, a researcher sued over statements that his work reflected "'a reckless disregard for the truth'" and that he "'knowingly engag[ed] in scientific misconduct and fraud.'" *Id.* at 714–15. Affirming summary judgment for the speaker, the Sixth Circuit held that such "imprecise" and "'value-laden'" characterizations "signal to the listener that the speaker is expressing a subjective point of view." *Id.* at 714 (citation omitted). And where the speaker "'states the facts on which he bases his opinion . . . and then expresses a comment[,]'" the result is "a properly qualified expression of opinion" that "cannot support an action for defamation." *Id.* at 716–17 (quoting Restatement 2d of Torts § 566). Innumerable courts agree: Generic accusations of unprofessional conduct—precisely what Plaintiff asserts here is defamatory—are inactionable. *See, e.g., Piccone v. Bartels*, 40 F. Supp. 3d 198, 210 (D. Mass. 2014) (statements that plaintiffs were "unprofessional" were "unambiguously expressions of opinion" that "cannot be conclusively proved or disproved"), *aff'd*, 785 F.3d 766 (1st Cir. 2015); *Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 315–16

(S.D.N.Y. 2017) ("[A]ny generic accusation 'that someone has acted unprofessionally or unethically,' is a 'constitutionally protected statement[ ] of opinion.'" (citation omitted)); *Kane v. Chester Cnty.*, 811 F. App'x 65, 70 (3d Cir. 2020) (statements that the plaintiff's conduct "call[ed] into serious question [his] judgment and ability" were "opinion . . . based on disclosed or assumed nondefamatory facts" and thus "[in]sufficient for an action of defamation" (cleaned up)); *Hogan v. Weymouth*, No. CV 19-2306-MWF, 2019 WL 11055032, at \*4 (C.D. Cal. Aug. 19, 2019) (statements that the plaintiff "was unprofessional, insensitive, and aggressive" are "non-actionable"); *Bergh v. Zoelle*, No. 24-3054, 2025 WL 1746904, at \*4 (D. Minn. June 24, 2025) (statements that conduct "was unprofessional are nonactionable opinion" (citation omitted)); *Bisch v. County of Yolo*, No. 2:23-cv-00455-DC-SCR, 2026 WL 483073, at \*28 n.32 (E.D. Cal. Feb. 20, 2026) ("[A] statement that someone is unethical is broadly understood to be a statement of opinion."); *Turner v. Wells*, 198 F. Supp. 3d 1355, 1368–72 (S.D. Fla. 2016), *aff'd*, 879 F.3d 1254 (11th Cir. 2018).

For these reasons, all of Ms. Owens's statements concerning Plaintiff's professionalism are inactionable statements of opinion. As such, all of Plaintiff's claims based on those statements must be dismissed.

**B.     PLAINTIFF IS A LIMITED-PURPOSE PUBLIC FIGURE WHO MUST PLAUSIBLY PLEAD ACTUAL MALICE BUT HAS NOT DONE SO.**

The challenged claims also fail because Plaintiff's negligence claims are unavailable. As to every challenged statement at issue here, Plaintiff pleads that Ms. Owens published "negligently, in that Owens failed to exercise reasonable care in verifying the truth or falsity of the statements prior to publication." (Compl. ¶¶ 93, 111, 154.) But that theory is unavailable to Plaintiff: As a limited-purpose public figure, he must prove actual malice, so "[m]ere negligence does not suffice." *Masson*, 501 U.S. at 510.

When a "plaintiff is a public figure, [the plaintiff] must prove by clear and convincing evidence that the defendant made the defamatory statements with knowledge the statements were false or with reckless disregard to their truth, a standard known as 'actual malice.'" *Elsten v. Coker*, No. M2019-00034-COA-R3-CV, 2019 WL 4899759, at \*3 (Tenn. Ct. App. Oct. 4, 2019) (citing *N.Y. Times Co.*, 376 U.S. at 279–80). Whether a plaintiff is a public figure is a "question of law" for the Court. *Tomlinson v. Kelley*, 969 S.W.2d 402, 405 (Tenn. Ct. App. 1997); *see also Trigg v. Lakeway Publishers, Inc., d/b/a The Elk Valley Times*, 720 S.W.2d 69, 74 (Tenn. Ct. App. 1986) (finding that a plaintiff who "injected himself into the public controversy" was a public figure).

Plaintiff is at least a limited-purpose public figure as to the controversy surrounding Kirk's assassination. Tennessee applies a two-step analysis: The Court "define[s] the public controversy and determine[s] its contours" then "determine[s] whether the plaintiff is a public figure for purposes of that controversy." *Charles v. McQueen*, 693 S.W.3d 262, 274 (Tenn. 2024) (citation omitted). A "public controversy" is "a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." *Thomas M. Cooley L. Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 529 (6th Cir. 2014) (quotation omitted). The televised murder of a nationally prominent political figure and the adequacy of the security that failed to prevent it is such a controversy: By the Complaint's own account, the assassination generated widespread national commentary, including conspiracy theories advanced by "commentators" of every stripe. (Compl. ¶ 22.)

At the second step, a person is a limited-purpose public figure where he has "thrust [him]sel[f] to the forefront of [the] particular public controvers[y] in order to influence the resolution of the issues involved." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974); *accord Charles*, 693 S.W.3d at 274. Courts also consider "the extent to which participation in the

controversy is voluntary[,]" "the extent to which there is access to channels of effective communication[,]" and "the prominence of the role played[.]" *Cooley,* 759 F.3d at 530.

Plaintiff's own Complaint satisfies all three factors. As to prominence: As the founder and head of the security firm responsible for protecting Mr. Kirk when he was killed, Plaintiff occupied a prominent role. (Compl. ¶¶ 4, 21.) As to voluntary participation and access to channels of effective communication: Plaintiff took the controversy to two of the most widely distributed platforms in the country, appearing by name before millions on the Shawn Ryan Show, **Ex. 6**, Shawn Ryan Show Ep. 254 (Nov. 17, 2025), and giving a second national interview to Gary Melton after that, **Ex. 7**, Gary Melton Interview (Nov. 25, 2025). Plaintiff also used those platforms to give his own account of the security operation, to address the central public question of why it failed, to pass blame to others, and to urge the public to join the controversy. *See supra*, at 6–8. Those appearances independently establish Plaintiff's access to channels of effective communication and refute the assertion that Plaintiff "has no public platforms to effectively rebut[.]" (*See* Compl. ¶ 29.)

The Complaint also refutes its own "no access" allegation for another reason: It pleads that Ms. Owens contacted Plaintiff and offered him the opportunity to address the matter, which Plaintiff declined. (*Id.* at ¶ 54.) A plaintiff who appeared voluntarily on two prominent national platforms—and was offered but declined access to a third—cannot have lacked the means to be heard.

Plaintiff now says his multiple voluntary appearances before huge national audiences were strictly "defensive" while implying they were motivated by Ms. Owens. (*Id.* at ¶ 29.) But Plaintiff gave different explanations for his participation on the podcast appearances themselves. *See* **Ex. 6**, Shawn Ryan Show Ep. 254 (Nov. 17, 2025), at 2:1–3:21; **Ex. 7**, Gary Melton Interview (Nov.

25, 2025), at 3:4–14. Plaintiff also never mentioned Ms. Owens in his purportedly "defensive" Shawn Ryan appearance. *See generally* **Ex. 6**, Shawn Ryan Show Ep. 254 (Nov. 17, 2025). And Ms. Owens never mentioned Plaintiff's name until *after* Plaintiff went on Shawn Ryan's show. *See supra*, at n.2. Further, even when the Melton host raised Ms. Owens by name and asked for Plaintiff's "response to her[,]" Plaintiff declined to engage and instead used his appearance to speak to broader themes. *See* **Ex. 7**, Gary Melton Interview (Nov. 25, 2025), at 105:19–106:20.

Thus, the actual facts demonstrate that Plaintiff—already a prominent figure concerning Charlie Kirk's death due to his responsibility to prevent it—voluntarily entered a national controversy, on multiple national platforms, to be heard on the matter. Thus, from at least that point forward, Plaintiff was a limited-purpose public figure. *See Charles*, 693 S.W.3d at 277–79; *see also Orr v. Argus-Press Co.*, 586 F.2d 1108, 1116 (6th Cir. 1978) ("He voluntarily sought publicity for his project and then found himself, through his own alleged misdeeds, at the center of a public scandal. We believe that application of the constitutional 'actual malice' test is fully warranted under these circumstances[.]"); *Carr v. Forbes, Inc.*, 259 F.3d 273, 281 (4th Cir. 2001) (emphasizing that a plaintiff "voluntarily injected himself into the public debate by 'attempt[ing] to influence the merits of [the] controversy'" (citation omitted)).

Plaintiff's own labels do not change this. True, his Complaint pleads that he appeared "solely to respond to and rebut the defamatory statements" (Compl. ¶ 28), that his appearances were "isolated responses undertaken by him to defend his reputation" (*id.*), and that he "did not seek publicity or attempt to influence public debate" (*id.* at ¶ 29). But Plaintiff's status as a limited-purpose public figure is a question of law for the Court, *Tomlinson*, 969 S.W.2d at 405, and it turns on what Plaintiff *objectively did*, rather than implausible characterizations he offers later. That is especially true when Plaintiff's characterizations are belied by both his own contemporaneous

statements about his motivations (as reflected in transcripts the Complaint omits) and linear time.

Here, the Complaint's allegations about why he appeared before multiple national audiences are contradicted by Plaintiff's own recorded words on the interviews he gave. Plaintiff alleges he "did not seek publicity or attempt to influence public debate" and appeared "solely" to rebut defamatory statements. (Compl. ¶¶ 28–29.) But that is not what Plaintiff said during his appearances. He also did not describe either appearance as a response to Ms. Owens (or even mention her in the first). And he said he came because the public treatment of the assassination had become "sickening" while using his two voluntary appearances on massive platforms to give his own account of why the security failed, to pass blame to the university police chief, and to urge the public to join the controversy. *See supra*, at 6–8; **Ex. 6**, Shawn Ryan Show Ep. 254 (Nov. 17, 2025), at 2, 43:1–46:13; **Ex. 7**, Gary Melton Interview (Nov. 25, 2025), at 3:4–14, 62:7–19, 83:22–84:10.

A person who does that has "thrust [him]sel[f] to the forefront of [the] particular public controvers[y] in order to influence the resolution of the issues involved." *Gertz*, 418 U.S. at 345. And Plaintiff's contrary claims in his Complaint are provably false based on his statements in the interviews themselves and the chronology of Ms. Owens's statements.

Thus, this is not a case of a defendant "'creat[ing] [its] own defense . . . by making the claimant a public figure.'" *Charles*, 693 S.W.3d at 278 (quoting *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979)). Ms. Owens did not make Plaintiff a public figure; Plaintiff injected *himself* into the public controversy by stepping onto a national stage voluntarily before millions of listeners to take part in a public conversation about the security failure that led to the death of the public figure Plaintiff was tasked with protecting. And once Plaintiff did so, he became a limited-purpose public figure from at least that point forward. *See Charles*, 693 S.W.3d at 277–78.

Plaintiff's public-figure status is dispositive of his negligence theories. A public figure cannot recover on a showing of negligence; instead, Plaintiff must prove that Ms. Owens published statements "with knowledge that [they were] false or with reckless disregard of whether [they were] false or not." *Masson*, 501 U.S. at 510 (quotation omitted). Here, Plaintiff's core fault allegations—that Ms. Owens "failed to exercise reasonable care in verifying the truth or falsity of the statements prior to publication" (Compl. ¶¶ 93, 111, 154)—are simple negligence theories. Thus, they fail as a matter of law, and Plaintiff is left to his allegations of actual malice.

As to the statements challenged here, Plaintiff's public-figure status also is dispositive of his actual malice theory, because Plaintiff has not plausibly pleaded actual malice as to any of them. Malice must be pleaded plausibly under *Iqbal*: "[T]he plausibility pleading standard applies to the actual malice standard in defamation proceedings[,]" and a complaint that does not "give rise to a reasonable inference of actual malice" must be dismissed. *Michel*, 816 F.3d at 702 (collecting authority); *see also Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012) (though malice "'may be alleged generally[,]'" a plaintiff "must still lay out enough facts from which malice might reasonably be inferred" (quoting Fed. R. Civ. P. 9(b))); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013). Further, because malice cannot be shown in the abstract, it must be pleaded *as to each allegedly defamatory statement. See Church of Scientology Int'l v. Time Warner, Inc.*, 903 F. Supp. 637, 641 (S.D.N.Y. 1995) (a court must "consider[] each allegedly libelous statement individually to determine whether a rational finder of fact could find actual malice"), *aff'd*, 238 F.3d 168 (2d Cir. 2001).

Plaintiff's malice claims almost exclusively concern the Fort Huachuca matter, addressing "plane tickets[,]" the "alleged Fort Huachuca meeting[,]" "Mitch Snow," the "'incident report,'" and Ms. Owens's alleged "theory alleging Harpole's involvement" in Kirk's death. (Compl. ¶

94(a)–(f).) But none of these allegations bears on whether Ms. Owens subjectively doubted her opinions that Plaintiff's security work was deficient. And setting the Fort Huachuca allegations aside, the Complaint pleads no facts plausibly alleging that Ms. Owens "entertained serious doubts as to the truth" of any statement challenged here. *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

Indeed, what little the Complaint does allege *defeats* malice as to the statements challenged here. On the medical-bag and performance commentary, Plaintiff concedes that Ms. Owens (1) stated "Harpole ran over to Kirk with Harpole's medical bag" (Compl. ¶¶ 94(h), 112) and (2) "admitted publicly" the exculpatory facts involved (*id.* at ¶ 113). That is the opposite of a knowing or reckless falsehood.

Plaintiff's only other theory of malice is that Ms. Owens "disregarded" counterevidence and "failed to investigate[.]" (*Id.* at ¶¶ 95, 111, 122.) But "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard[,]" and proceeding despite contrary material does not show malice absent facts establishing subjective doubt. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989); *St. Amant*, 390 U.S. at 731.

The Complaint also *negates* any inference of purposeful avoidance of the truth. Plaintiff concedes Ms. Owens contacted him directly and offered him the opportunity to discuss the matter before publishing, which Plaintiff declined. (Compl. ¶ 54.) That concession controls: A speaker's effort to obtain the subject's side affirmatively negates actual malice. *See, e.g.*, *Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 24–25 (1st Cir. 2018) (no actual malice where the defendant sought comment from the plaintiff to confirm or rebut reports from other sources); *Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 686 (9th Cir. 1990) (attempts to obtain a plaintiff's account dispel any claim of purposeful avoidance of the truth). The challenged statements therefore fail in their entirety,

whether measured by the negligence standard Plaintiff invokes or the actual-malice standard the law requires.

## C.    PLAINTIFF HAS NOT PLAUSIBLY PLEADED CAUSALLY CONNECTED DAMAGES.

"[T]o establish any type of defamation claim, whether slander or libel, the claimant must prove that the defamation *resulted in* injury to the person's character and reputation." *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013) (emphasis added). This Court has recently emphasized this element and the common-sense connection that an actionable causation theory in defamation cases requires. *See Poe v. Lowe*, No. 3:24-CV-00368, 2026 WL 1231217, at *9 (M.D. Tenn. May 5, 2026) (citing *Brown*, 428 S.W.3d at 50).

Plaintiff's own Complaint supplies the obvious explanation for why he suffered a loss in professional standing: The public figure he was responsible for protecting was murdered on his watch (Compl. ¶¶ 4, 20–21), and Plaintiff drew criticism from "commentators" of every stripe and from "thousands of people across social media platforms" as a result (*id.* at ¶¶ 22, 77, 80). And where a claimed injury has an "'obvious alternative explanation[,]'" the inference that a defendant caused it is not plausible. *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567).

Here, the most obvious explanation for the damage Plaintiff claims to have suffered has nothing to do with whether Ms. Owens opined that he should be fired. Plaintiff also pleads nothing to bridge the gap. He alleges in conclusory terms and without specificity that he "lost major clients[,]" that his "reputation . . . plummeted[,]" and that he suffered "emotional distress." (Compl. ¶¶ 79–80.) But he does not plausibly allege any facts demonstrating that a client terminated him, that an identifiable person thought less of him, or that he lost any opportunity *because of something other than his failure to protect Mr. Kirk*. That defect is fatal: A plaintiff who "refers in the most general terms to damages in the form of loss of reputation" but offers no facts to "attribute any

such loss to [the defendant's] alleged remark rather than to the behavior that she was commenting on" has not pleaded actionable, causally connected damages. *Kersey*, 2006 WL 3952899, at *6.

**D.** **PLAINTIFF'S FALSE LIGHT CLAIM, WHICH IS REDUNDANT OF HIS DEFAMATION CLAIMS AND FAILS ON THE MERITS, AND IMPERTINENT PORTIONS OF PLAINTIFF'S COMPLAINT SHOULD BE STRICKEN.**

Federal Rule of Civil Procedure 12(f) authorizes courts to strike "redundant" matter. Here, Plaintiff's false light claim is redundant of his defamation claims and is inactionable regardless.

The essence of a false light claim is that "the angle from which . . . facts are presented, or the omission of certain material facts, results in placing the plaintiff in a false light." *West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 645 n.5 (Tenn. 2001). The tort thus affords relief "distinct" from defamation. *Id.* at 645; *see also, e.g.*, *Gallon v. Hustler Mag., Inc.*, 732 F. Supp. 322, 325 (N.D.N.Y. 1990) (presenting actionable false light theory).

With this context in mind, false light is not a watered-down defamation theory that enables litigants to skirt constitutional defamation requirements under more lenient standards. *See Boladian v. UMG Recordings, Inc.*, 123 F. App'x 165, 169 (6th Cir. 2005) (citing *Hustler Mag. v. Falwell*, 485 U.S. 46, 53 (1988)); *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 601 n.9 (6th Cir. 2013) (such claims "appear to be an attempt to bypass the First Amendment"); *SmileDirectClub*, 708 S.W.3d at 582 ("[P]laintiffs cannot avoid the First Amendment limitations on defamation claims by seeking publication damages under non-reputational tort claims[.]" (cleaned up)). Nor does false light reach defamatory implications; that is the province of defamation-by-implication claims. *See Isbell*, 2000 WL 1817252, at *6. Instead, false light claims are unique to themselves.

Plaintiff concedes the redundancy of his false light claim. His Complaint pleads that "[t]o the extent this Count is duplicative of Counts I and II, this Count is pled in the alternative." (Compl. ¶ 118.) His false light claim also rests on the same facts as his defamation claims (*id.* at ¶ 117),

and it rests on the same alleged injuries arising from the same publications (*compare id.* at ¶¶ 117–124, *with id.* at ¶¶ 82–116). The claim thus only can be characterized as redundant. And when plaintiffs file redundant false light claims alongside defamation claims in this way, striking is an appropriate remedy. *See* James B. Lake, *Restraining False Light: Constitutional and Common Law Limits on A "Troublesome Tort"*, 61 FED. COMM. L.J. 625, 649 (2009) ("A second option would be a motion to strike the false light claim as redundant. Federal Rule of Civil Procedure 12(f) empowers a district court to strike 'redundant . . . matter,' such as 'a claim that merely recasts the same elements [as another count] under the guise of a different theory.'").

Plaintiff's false light claim also fails on the merits for two reasons.

*First*, the claim is governed by an actual malice standard Plaintiff has not plausibly pleaded. *See West*, 53 S.W.3d at 647–48 ("[A]ctual malice is the appropriate standard for false light claims when the plaintiff is a public official or public figure, or when the claim is asserted by a private individual about a matter of public concern."). As detailed above, Plaintiff is a limited-purpose public figure, and the statements at issue here concern a quintessential matter of public concern. Either way, actual malice is required, and Plaintiff has not plausibly pleaded that Ms. Owens acted with knowledge of falsity or reckless disregard.

*Second*, the claim fails on causation grounds. "Consistent with defamation, . . . plaintiffs seeking to recover on false light claims must specifically plead and prove damages allegedly suffered *from the invasion of their privacy*." *Id.* at 648 (emphasis added). But as already explained, Plaintiff has not plausibly alleged facts demonstrating his claimed damages stem from anything other than their most obvious explanation: Plaintiff's failure to protect Mr. Kirk.

Apart from this, the Complaint contains abundant "immaterial" and "impertinent" allegations, *see* Fed. R. Civ. P. 12(f), regarding "the First Lady of France," "the Iran war," and

"Israeli Prime Minister Bibi Netanyahu" (Compl. ¶ 19). These allegations have nothing to do with Plaintiff's claims or injuries. They should be stricken accordingly. *See id.*

**E.      PLAINTIFF'S CIVIL CONSPIRACY AND AIDING-AND-ABETTING CLAIMS FAIL AS A MATTER OF LAW.**

Counts V and VI seek to hold Ms. Owens liable for Mitch Snow's statements on conspiracy and aiding-and-abetting theories. (*See* Compl. ¶¶ 138–50.) But neither theory is viable as pleaded, given that each is a specific-intent theory while Plaintiff pleads the operative conduct in negligence.

Civil conspiracy requires that "the conspiring parties intend to accomplish an unlawful purpose, or a lawful purpose by unlawful means." *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 39 (Tenn. Ct. App. 2006); *accord Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703 (Tenn. 2002) ("An actionable civil conspiracy is a combination of two or more persons who, each having the intent and knowledge of the other's intent[.]"). Aiding and abetting likewise requires proof a defendant "knew that [the primary actor's] conduct constituted a breach of duty[.]" *PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 552 (Tenn. Ct. App. 2012) (quotation omitted). Each theory requires intent and knowledge. Thus, definitionally, one cannot *negligently* conspire or aid and abet.

Plaintiff's Complaint alleges negligence, though. Count VI alleges the Owens Defendants "published Snow's defamatory statements concerning Harpole *negligently*, in that Owens failed to exercise reasonable care in verifying the truth or falsity of the statements prior to publication." (Compl. ¶ 154 (emphasis added).) And Snow's alleged defamation—which is cast as the conspiracy's "unlawful purpose"—is itself pleaded, alternatively, as mere negligence. (Compl. ¶¶ 93, 111, 134.)

Plaintiff's negligence claims cannot support a specific-intent theory. *See State v.*

*Kimbrough*, 924 S.W.2d 888, 891 (Tenn. 1996) ("[R]ecklessness and negligence are incompatible with desire or intention."). Tennessee courts also have suggested the impossibility of relief in this precise setting: The Tennessee Court of Appeals has remarked that "[a]lthough Tennessee has not addressed this issue, some states have held that conspiracy to commit constructive fraud is a legal impossibility because one cannot conspire to commit a [wrong] for which he does not have the intent to commit." *Kincaid*, 221 S.W.3d at 39 n.8. Thus, to the extent Counts V and VI rest on negligence, they must be dismissed.

Plaintiff's civil conspiracy claim also is inadequately supported. A civil conspiracy requires "(1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury." *Id.* at 38 (citation omitted). So measured, Plaintiff's conspiracy claim fails to state a claim upon which relief can be granted.

Stripped of conclusory recitations of elements—that Defendants "agreed to and entered a conspiracy[,]" Compl. ¶ 142—Plaintiff pleads no *facts* establishing a conspiracy. Plaintiff certainly does not do so *with specificity*, which Tennessee law requires. *See Kincaid*, 221 S.W.3d at 38 ("Conspiracy claims must be pled with some degree of specificity. . . . Conclusory allegations . . . unsupported by material facts will not be sufficient to state such a claim." (citation omitted)).

Instead, Plaintiff alleges only that Ms. Owens received a tip, spoke with Snow by telephone, and published the interview and commentary about it. (Compl. ¶¶ 140–43.) A journalist's decision to interview a source and report what he says is not evidence of a conspiracy (or even consistent with one), however. Plaintiff's claim thus depends on "'naked assertion[s]'" and "conclusory" recitals that—under *Iqbal*—are "not entitled to the assumption of truth." 556 U.S. at 678–80 (citation omitted).

**F.** **THE TPPA INDEPENDENTLY REQUIRES DISMISSAL AND AN AWARD OF FEES.**

The same defects that compel dismissal under Rule 12(b)(6) also entitle the Owens Defendants to relief under the TPPA. The TPPA applies because Plaintiff has sued the Owens Defendants in response to statements "made in connection with a matter of public concern[.]" Tenn. Code Ann. § 20-17-103(3). That threshold turns on the subject matter of Ms. Owens's speech, not on Plaintiff's status as a public figure (though Plaintiff's public-figure status alone suffices, *see* § 20-17-103(6)(D)).

Commentary on failures by security personnel who were supposed to protect a prominent political figure who was assassinated on live television sits squarely within the statute's enumerated categories. Such commentary relates to "safety[,]" "community well-being[,]" "[t]he government[,]" a "public figure[,]" Plaintiff's and Integrity Security Solutions's "service in the marketplace[,]" and—apart from these categories—to "[a]ny other matter deemed by a court to involve a matter of public concern[.]" § 20-17-103(6)(A), (B), (C), (D), (E), (G). The murder of Charlie Kirk and the conduct of his security detail also were, by the Complaint's own account, the subject of sustained national debate. (*See* Compl. ¶ 22.) And Plaintiff's Complaint asserts repeatedly that Plaintiff has sued the Defendants in response to their statements on the matter. (*See, e.g.*, *id.* at ¶¶ 84, 90, 93, 97, 111); *cf. Secure Air Charter, LLC v. Barrett,* No. M2025-00312-COA-R3-CV, 2026 WL 473237, at *6 (Tenn. Ct. App. Feb. 19, 2026) (a plaintiff's own statements in pleadings may satisfy a petitioner's burden).

For these reasons, the TPPA applies here. § 20-17-105(a). Plaintiff thus must come forward—as he would need to do in response to a Rule 56 motion—with admissible evidence to support each essential element of his claims. § 20-17-105(b). Even then, "the court shall dismiss the legal action" based on the Defendants' valid Rule 12(b)(6) defenses above. § 20-17-105(c).

Dismissal under the TPPA must be "with prejudice[,]" § 20-17-105(e), and it triggers a mandatory award of "[c]ourt costs, reasonable attorney's fees, discretionary costs, and other expenses[,]" Tenn. Code Ann. § 20-17-107(a)(1). Thus, after this Court grants their TPPA Petition, the Owens Defendants request leave to brief the costs, attorney's fees, and expenses they are due here.

**G.** **PLAINTIFF SEEKS UNCONSTITUTIONAL INJUNCTIVE RELIEF.**

Plaintiff asks this Court to issue a "permanent injunction requiring the removal of the defamatory statements[.]" (Compl. at 68 ¶ ii.) He further asks this Court to "enjoin[] Defendants from republishing or reposting the deleted media and similar such statements in the future[.]" (*Id.*) Both requests are unconstitutional.

**1.** **Plaintiff's retraction demand is unconstitutional.**

The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *See Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Thus, courts may not lawfully compel speakers to retract or remove published statements. *See, e.g.*, *Kramer v. Thompson*, 947 F.2d 666, 680–82 (3d Cir. 1991) ("[W]e have not found a single case in which [a compelled retraction] remedy has been awarded. . . . [T]hose orders of the district court compelling such retractions and withdrawals . . . must be reversed."); *Berman v. Kafka*, No. 3:13-CV-1109-J-JBT, 2015 WL 12940184, at *3 (M.D. Fla. July 10, 2015) (A court-ordered retraction is not "a cognizable form of equitable relief."); *Romspen Inv. LP v. Dibert*, No. 23-CV-80992-RLR, 2025 WL 2145736, at *2 (S.D. Fla. Jan. 14, 2025) ("Plaintiff's request that the Court compel Defendant to post a retraction [fares] no better. Content-based compelled speech is subject to strict scrutiny." (citation omitted)); *accord Kelly Sutherlin McLeod Architecture, Inc. v. Schneickert*, 125 Cal. Rptr. 3d 83, 95 (Ct. App. 2011) ("[I]n deference to the First Amendment, [a party] may not be compelled

to include a mea culpa."); *Mazur v. Szporer*, No. CIV.A. 03-00042(HHK), 2004 WL 1944849, at *8 (D.D.C. June 1, 2004) ("A party cannot compel another to publish information it has chosen not to publish."). As a result, Plaintiff's retraction demand should be dismissed.

### 2.    <u>Plaintiff's prior-restraint demand is unconstitutional.</u>

Plaintiff's related demand for a permanent prior restraint "enjoining Defendants from republishing or reposting" (Compl. at 68 ¶ ii) is similarly unconstitutional. "[P]rior restraints on speech . . . are the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Thus, "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). "[P]ermanent injunctions—*i.e.*, court orders that actually forbid speech activities—are classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550 (1993). And an "order that forbids speech with specified content" is "a 'classic' form of prior restraint[.]" Aaron H. Caplan, *Free Speech and Civil Harassment Orders*, 64 HASTINGS L.J. 781, 824 (2013) (collecting cases).

The presumption against constitutional validity applies with special force to requested *defamation* injunctions. The general rule—both in Tennessee and as a matter of federal judicial power—is that "'[e]quity does not have jurisdiction to act for the sole purpose of restraining the utterance of a libel or slander, regardless of whether the defamation is personal or relates to a property right.'" *Kyritsis v. Vieron*, 382 S.W.2d 553, 557 (Tenn. Ct. App. 1964) (citation omitted); *accord Cmty. for Creative Non-Violence v. Pierce*, 814 F.2d 663, 672 (D.C. Cir. 1987) ("The usual rule is 'that equity does not enjoin a libel or slander and that the only remedy for defamation is an action for damages.'" (quoting *Kukatush Mining Corp. v. SEC*, 198 F. Supp. 508, 510–11 (D.D.C. 1961))). Thus, "courts have long held that equity will not enjoin a libel. . . . Indeed, for almost a

century the Second Circuit has subscribed to the majority view that, absent extraordinary circumstances, injunctions should not ordinarily issue in defamation cases." *Metro. Opera Ass'n, Inc. v. Loc. 100, Hotel Emps. & Rest. Emps. Int'l Union*, 239 F.3d 172, 177 (2d Cir. 2001) (citations omitted); *see also e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 605 (7th Cir. 2007) ("[A]lthough we decline to address them fully in the context of this injunction that we already have determined cannot stand, we note that there are sensitive First Amendment issues presented in the context of permanent injunctions in defamation actions."). Further, because "[b]y its very nature, defamation is an inherently contextual tort[,]" "[a]n injunction that prevents in perpetuity the utterance of particular words and phrases after a defamation trial" may still be unconstitutional even after words and phrases have been found defamatory, as "[w]ords that were false and spoken with actual malice on one occasion might be true on a different occasion or might be spoken without actual malice." *Sindi v. El-Moslimany*, 896 F.3d 1, 33 (1st Cir. 2018) (citations omitted).

For these reasons, this Court lacks authority to enter a permanent injunction restraining speech about the public-figure Plaintiff in this case. Thus, this Court should dismiss Plaintiff's unconstitutional demand for a permanent prior restraint for failure to state a claim.

## V.  CONCLUSION

For the foregoing reasons, the Owens Defendants respectfully request that this Court:

1.      grant this Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) and dismiss Counts I through VI of the Complaint with prejudice;

2.      grant this Tennessee Public Participation Act Petition to Dismiss and dismiss Counts I through VI of the Complaint with prejudice under Tennessee Code Annotated section 20-17-105;

3.      award the Owens Defendants court costs, reasonable attorney's fees, discretionary

costs, and other expenses under section 20-17-107;

4.      strike Plaintiff's false light claim (Count III) as redundant under Federal Rule of Civil Procedure 12(f);

5.      strike impertinent and immaterial allegations concerning "the First Lady of France," "the Iran war," and "Israeli Prime Minister Bibi Netanyahu" under Federal Rule of Civil Procedure 12(f); and

6.      dismiss Plaintiff's demands for unconstitutional injunctive relief.

Respectfully submitted,

By:     /s/ Daniel A. Horwitz
        DANIEL A. HORWITZ, BPR #032176
        HORWITZ LAW, PLLC
        4016 WESTLAWN DRIVE
        NASHVILLE, TN 37209
        (615) 739-2888
        daniel@horwitz.law

        ROBERT A. PEAL, BPR #025629
        MEGAN CATHERINE CHAMBERS, BPR #042312
        SIMS FUNK, PLC
        3102 West End Avenue, Ste. 1100
        Nashville, TN 37203
        (615) 292-9335
        (615) 649-8565 (f)
        rpeal@simsfunk.com
        mchambers@simsfunk.com

        *Counsel for Defendants Candace Owens, Candace Owens LLC, and GeorgeTom, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2026, a copy of the foregoing was filed and served via

the Court's electronic filing system to the following:

TARA L. SWAFFORD
ELIZABETH G. HART
THE SWAFFORD LAW FIRM, PLLC
321 Billingsly Court, Ste. 19
Franklin, TN 37067
tara@swaffordlawfirm.com
betsy@swaffordlawfirm.com

JACOB W. ROTH
*PRO HAC VICE*
2255 Glades Road, Ste. 324A
Boca Raton, FL 33431
jroth@contarinoroth.com

MATTHEW SARELSON
DHILLON LAW GROUP, INC.
1601 Forum Place, Ste. 202
West Palm Beach, FL 33401
msarelson@dhillonlaw.com

*Counsel for Plaintiff*

MITCHELL SNOW
9315 Welsh Dr.
Pasco, WA 99301
justice4nate@pm.me

*Defendant*

/s/ Daniel A. Horwitz
DANIEL A. HORWITZ, BPR #032176

- 35 -