IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| BRIAN HARPOLE,<br><br>Plaintiff,<br><br>v.<br><br>CANDACE OWENS, et al.,<br><br>Defendants. | Case No. 3:26-cv-00556<br><br>District Judge: None<br>Magistrate Judge: None<br><br>JURY DEMAND |

**BRIAN HARPOLE'S RESPONSE IN OPPOSITION TO DEFENDANT SNOW'S MOTION TO DISMISS**

Plaintiff Brian Harpole ("Harpole") hereby files his response in opposition to Defendant Mitchell Snow's ("Snow") Motion to Dismiss.

## INTRODUCTION

This case is a straightforward matter of defamation for profit. On September 10, 2025, America's most prominent youth political activist, Charlie Kirk, was publicly murdered by Tyler Robinson at Utah Valley University ("UVU"), who turned himself in the next day after the killing on September 11 and has admitted guilt. *See* Matthew Brown, *Defense in Charlie Kirk's killing say shooter should get death penalty, hit 'intended target'*, Associated Press (Aug. 12, 2026), https://apnews.com/article/charlie-kirk-assassination-death-penalty-tyler-robinson-2e486bce004797c86f0bab4533a96a6f.

Despite Robinson's clear guilt, Defendant Owens—perhaps the highest-profile conspiracy theorist on the internet—seized an opportunity to further her business model of monetizing ever greater scandal, positioning herself as the leading truther about the "real" identity of Kirk's assassin. *See* ECF No. 1 ¶¶ 22. As Plaintiff Brian Harpole alleges, in the wake of Kirk's

assassination, Owens rapidly began promoting conspiracy theories about complex plots behind the crime on her daily show. *Id*. ¶¶ 22–27. These include sinister accusations that Kirk was failed and betrayed by those closest to him, some of whom were supposedly in league with shadowy government forces. *Id*. ¶¶ 23–27, 32. UVU was responsible for security at the event on its campus where the assassination took place; Harple oversaw a limited portion of the security arrangements on behalf of Turning Point USA. *Id*. ¶ 4. Owens targeted her defamatory accusations about responsibility for Kirk's death at Harpole both directly and by association as part of Turning Point USA's security team. *Id*. ¶¶ 22–27, 30–33.

On December 8, 2025, Snow initiated contact with Owens to provide her a fabricated narrative to use on her show that fit with the conspiracy theories about the Kirk assassination that she was already monetizing. *Id*. ¶¶ 36, 127–128. Snow, a civilian who lives in Washington, claimed to have somehow found his way onto the secure U.S. Army installation at Fort Huachuca, Arizona the day before the Kirk assassination. He claimed that, rather than being arrested for trespassing, he accidentally entered a classified meeting of high-ranking officials and saw someone whom he was certain was Harpole.[1] *Id*. ¶¶ 34–39, 127–130. This facially absurd story has, needless to say, not been supported by corroborating evidence.[2] Harpole directly alleges that Snow's entire story is false, that Snow willfully fabricated it without any plausible basis in fact or misunderstanding, and that travel records show Harpole was in Texas on the day in question. *Id*. ¶¶ 42, 53, 55–57, 90, 94, 127–129, 132, 135.

[1] Snow likely never visited Ft. Huacuca at all as he claims, which is why his motion bends over backwards to urge the Court to not dive into the issue of who, if anyone, was present at the base on the day in question.

[2] Snow's supporting affidavit is conspicuously silent on the underlying facts.

Harpole alleges that Snow and Owens agreed during their conversation on December 8 to a conspiracy to defame Harpole for their mutual profit: Owens would profit from her publication of Snow's story on her show and through her media platforms to garner viewership she could monetize; Snow would profit from the fundraiser Owens announced on her show for Snow's benefit in connection with his story. *Id*. ¶¶ 52, 142. Owens then used her media platform as agreed, spreading Snow's story and using it as a springboard to make further insinuations that Harpole was involved in the plot behind Kirk's assassination. Id. ¶¶ 143–45. Snow furthered the alleged conspiracy by subsequently appearing remotely on Owens' Tennessee-based show, repeating his story, and bolstering its credibility. Snow assured the audience that he had a gift for recognizing people and was 95 to 99 percent certain that the person he saw at the suspicious meeting the day before the assassination was Harpole, not a look-alike. *Id*. ¶¶ 50–52, 147. Snow made his story even more outlandish by asserting that he saw Harpole walking out of the secret meeting with an unidentified congressman. *Id*. ¶ 51. Moreover, Owens publicly announced her creation of a legal defense fund for Snow as part of his appearance on her show; the only reasonable inference is that both Owens and Snow knew he would face legal liability for his lies about Harpole and Owens wanted to indemnify Snow without expressly indemnifying him.

Based on Snow's role in fabricating the story insinuating that Harpole was involved with the Kirk assassination and in working with Owens to spread the fabricated story as part of her "investigation" into the conspiracy behind the assassination, Harpole brought the present claims for defamation and conspiracy against Snow and related claims against Owens and her media entities.

Snow now seeks dismissal of Harpole's claims against him for lack of personal jurisdiction. Snow emphasizes that he lacks residential, travel, or regular business ties to Tennessee. But Snow

ignores his own voluntary, repeated, and tortious conduct in directing defamatory statements about Harpole into Tennessee for publication through Owens' Tennessee-based, Tennessee-produced media operation—conduct that forms "the heart of" Harpole's defamation claim against him. Those contacts more than suffice at this stage. Snow also ignores the Court's personal jurisdiction based on his alleged participation in a conspiracy with Owens and her entities.

Snow also seeks dismissal of Harpole's defamation and conspiracy claims on the merits. Snow argues that his challenged statements are not capable of defamatory meaning in context and that Harpole has not sufficiently alleged he acted with actual malice. But Snow's fabricated story, disseminated as part of a conspiratorial investigation into the true culprits behind the Kirk assassination, was plainly capable of insinuating Harpole's involvement with the assassination in context—and was understood to do so by its intended audience. The pleaded facts also establish that Harpole was a private figure who need only show Snow acted with negligence, though they plausibly allege actual malice based on Snow's knowing fabrication of his story.

As to conspiracy, Snow claims Harpole fails to allege an agreement and an underlying tort. Harpole's allegations regarding the December 8 call and subsequent conduct by Snow and Owens more than reasonably support inference of their agreement. And Harpole's allegations establish underlying defamatory conduct by both Snow and Owens.  None of Snow's arguments for dismissal are availing and his motion to dismiss must be denied accordingly.

//

//

## ARGUMENT

### I. The Court has personal jurisdiction over Snow based on his contacts with Tennessee and based on conspiracy jurisdiction.

When a court decides a Rule 12(b)(2) motion on written submissions, the plaintiff need make only a prima facie showing of jurisdiction, with the court considering the pleadings and affidavits "in the light most favorable to the nonmovant" and without weighting "the controverting assertions of the party seeking dismissal." *Carbone v. Kaal*, 140 F.4th 805, 808–09 (6th Cir. 2025). Snow's declaration denies domicile, travel, business operations, control over Owens' podcast, and intent to seek a Tennessee-specific audience or make a request for Tennessee-specific action. ECF No. 34 ¶¶ 3–15. But it does not deny Snow's deliberate, repeated contacts with Tennessee to publicize his defamatory statements about Harpole: the December 8 call to Owens, a Tennessee resident, to share the story for her to publish and to arrange their conspiracy and Snow's coordination with Owens for his December 18 appearance on her Tennessee-based, Tennessee-produced, Tennessee-published show to further disseminate his story. *Id*. ¶ 8. Those suit-related communications are sufficient to establish personal jurisdiction over Snow.

#### A. The Court has personal jurisdiction over Snow because of his voluntary, repeated use of Tennessee contacts to publicize defamatory statements against Harpole.

Tennessee's long-arm statute reaches any basis consistent with federal due process. Tenn. Code Ann. § 20-2-225(2); *Johnson v. Griffin*, 85 F.4th 429, 432 (6th Cir. 2023). Specific jurisdiction exists when (1) the defendant purposefully availed himself of acting or causing consequences in the forum, (2) the claim arises from or relates to those forum activities, and (3) the connection is substantial enough to make jurisdiction reasonable. *Carbone*, 140 F.4th at 810. Purposeful availment turns on contacts with the forum resulting from "the defendant's own choice" rather than from "random" or "fortuitous" contacts with the forum or "the unilateral activity of

another party or a third person." *Id.* (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021)).

Snow's voluntary and repeated contacts with Tennessee to publicize his defamatory statements about Harpole satisfy that test. Harpole alleges that Snow knowingly initiated contact with Owens, a Tennessee resident, communicated with her by phone to supply a defamatory story for her Tennessee-based media operation, authorized her to publicize the story through her Tennessee-produced show, and then coordinated with her to appear on that show to repeat his defamatory account. ECF No. 1 ¶ 8. Those contacts were not incidental or random, nor were they foisted on Snow by a third party without his knowledge or against his will. They were the Snow's freely chosen means to publish the statements at issue. *Carbone* is therefore distinguishable: there, the defendants did not select the Ohio servers through which the allegedly defamatory publications happened to pass, and the servers' location had no relationship to the alleged defamation. 140 F.4th at 811–13. Here, Snow allegedly chose Tennessee recipients and used their Tennessee operation to publish his defamatory story. Snow's alleged Tennessee contacts were his deliberately chosen tool for perpetrating his tort against Harpole; without them, Snow's defamation of Harpole would not have occurred.

*Neal v. Janssen* confirms that communications a defendant made into the forum can constitute purposeful availment. 270 F.3d 328, 332–33 (6th Cir. 2001). There, the Sixth Circuit emphasized that "[w]hen the actual content of the communications into the forum gives rise to an intentional tort action, that alone may constitute purposeful availment" because "[i]t is the quality of the contacts, not the quantity, that determines whether they constitute 'purposeful availment.'" *Id*. at 333 (citation omitted). Snow's alleged defamatory communications fit *Neal*. Their content—Snow's story placing Harpole at a classified military meeting the day before the Kirk assassination

to insinuate his involvement with the murder; coordination with Owens and her operation to publicize the story—gave rise to Harpole's defamation and conspiracy claims. Harpole's claims thus stem from Snow's voluntary and repeated Tennessee contacts.

The Supreme Court's opinion *Keeton v. Hustler Magazine, Inc.* points in the same direction. 465 U.S. 770 (1984). The Court held that a defamation plaintiff need not reside in the forum or suffer uniquely forum-centered injury when the defendant deliberately circulates the challenged publication there. *Id.* at 773–74, 780–81. Snow's alleged use of Owens' media operation to publicize his defamatory statements against Harpole made his contact with Tennessee an integral part of his defamatory conduct, not merely the incidental location of a server or an injured plaintiff. Snow thus has sufficient contacts with Tennessee related to Harpole's claims to support personal jurisdiction in this matter.

Snow's reliance on *Blessing*, *Reynolds*, *Walden*, and *Calphalon* does not change that result. Those decisions rejected assertions of jurisdiction that were based on incidental or fortuitous contacts with the forum, the plaintiff's forum injury, or contacts created by someone else. *Blessing v. Chandrasekhar*, 988 F.3d 889, 905–07 (6th Cir. 2021); *Reynolds v. Int'l Amateur Athletic Federation*, 23 F.3d 1110, 1119–20 (6th Cir. 1994); *Walden v. Fiore*, 571 U.S. 277, 284–86 (2014); *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 722–23 (6th Cir. 2000). Here, the alleged contacts with Tennessee result from Snow's own choices and concerted action: he deliberately communicated the story to a Tennessee resident for publication through a Tennessee-based media operation, authorized its publication by the Tennessee operation, and then coordinated his appeared on a Tennessee-produced program. ECF No. 1 ¶ 8. Harpole thus relies on Snow's chosen publication conduct, not merely Owens's location or a national audience's ability to access the program.

**B. Snow is also subject to conspiracy jurisdiction.**

"Although the Sixth Circuit has neither adopted nor rejected a 'conspiracy' theory of personal jurisdiction" and "district courts within the Sixth Circuit have split on the question," courts in this district have repeatedly applied conspiracy-based jurisdiction and the Tennessee Supreme Court has recognized it. *Daycab Co. v. Prairie Tech.*, No. 3:20-cv-63, 2021 U.S. Dist. LEXIS 249989, at *14-15 (E.D. Tenn. Aug. 13, 2021) (citing *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1237 (6th Cir. 1981)); *see Chenault v. Walker*, 36 S.W.3d 45, 53–54 (Tenn. 2001) (affirming conspiracy-based personal jurisdiction); *Cross v. Rodgers*, No. 3:16-cv-01128, 2017 U.S. Dist. LEXIS 119777, at *14 (M.D. Tenn. July 31, 2017) (applying *Chenault* conspiracy-jurisdiction analysis); *Sills v. S. Baptist Convention*, No. 3:23-cv-00478, 2024 U.S. Dist. LEXIS 41032, at *23 (M.D. Tenn. Mar. 8, 2024) (applying conspiracy jurisdiction analysis). Conspiracy jurisdiction applies when conspirators pursue a common plan they could reasonably expect to cause forum consequences, a co-conspirator commits forum acts in furtherance of that plan, and those acts would support jurisdiction if committed by the nonresident himself. *Cross*, No. 3:16-cv-01128, 2017 U.S. Dist. LEXIS 119777, at *13 (quoting *Chenault*, 36 S.W.3d at 53).

Harpole's Complaint satisfies this standard. Harpole alleges that Snow and Owens agreed during their December 8 call to use Owens's Tennessee-based media operation to publicize Snow's fabricated defamatory story; that Owens broadcast the story on December 9; that Snow and Owens coordinated his December 18 appearance and used it to further publicize the story to defame Harpole; and that Owens continued promoting the account afterward. ECF No. 1 ¶¶ 140–48. Snow could reasonably expect that plan to produce defamatory conduct in Tennessee because the agreed means of publication was Owens' media operation, produced and published from Tennessee. The

allegations therefore connect Snow personally to the plan and to the Tennessee acts undertaken to execute it and thus support conspiracy jurisdiction.

**C. Alternatively, limited jurisdictional discovery is warranted.**

If the Court finds the written record insufficient, it should permit targeted discovery prior to ruling on dismissal. Courts may authorize discovery needed to determine whether jurisdiction exists. *Theunissen v. Matthews*, 935 F.2d 1454, 1458, 1465 (6th Cir. 1991). In this case, such discovery should include a deposition of Snow and production of all of Snow's communications with Owens and her corporate entities and should address his knowledge of their Tennessee location and operation, his authorization of the December 9 publication of his defamatory story on Owens' show and her subsequent use of his story in her media operation, the planning and execution of the December 18 interview, and the planning and arrangements for the fundraiser Owens announced for Snow's benefit. Those facts bear directly on both Snow's purposeful availment of Tennessee and conspiracy jurisdiction, and responsive records are likely to be largely within Defendants' control.

## II. Harpole has sufficiently alleged that Snow defamed him by fabricating a story insinuating that Harpole was involved with the Kirk assassination.

Snow argues that Harpole's defamation claim fails because Snow's own words conveyed no defamatory meaning and Harpole does not allege that Snow acted with the requisite fault. Neither argument warrants dismissal. Harpole alleges multiple statements by Snow that are actionable in the context in which they were made. And although negligence is the governing minimum standard because Harpole is a private figure, Harpole's allegations that Snow knowingly fabricated his defamatory story plausibly plead actual malice as well.

//

### A. Snow's statements can reasonably convey a defamatory implication.

Under Tennessee law, courts evaluate the words, context, and overall gist of allegedly defamatory statements to determine whether they are reasonably capable of conveying a defamatory meaning. *Pate v. Serv. Merch. Co.*, 959 S.W.2d 569, 574 (Tenn. Ct. App. 1996) (internal citations omitted). A statement may be defamatory when it implies false facts even if its isolated words are literally true or facially innocuous. *Id.*; *Loftis v. Rayburn*, No. M2017-01502-COA-R3-CV, 2018 Tenn. App. LEXIS 201, at *15 (Ct. App. Apr. 20, 2018). The question is the meaning an ordinary reader or listener would reasonably understand in the surrounding circumstances. *Pate*, 959 S.W.2d at 574.

"A trial court may determine that a statement is not defamatory as a matter of law only when 'the statement is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense.'" *Grant v. Commer. Appeal*, No. W2015-00208-COA-R3-CV, 2015 Tenn. App. LEXIS 750, at *29 (Ct. App. Sep. 18, 2015) (citation omitted). Thus, the only question is whether it is *possible* for Snow's statements to convey a defamatory meaning to a reasonable listener.

*Pate* is particularly instructive for the present case. There, the defendant store employees' identification of the plaintiff as the woman who had previously purchased two VCRs with a credit card was not defamatory on its face, but it was made as part of a lineup during a theft investigation and therefore could (and did) reasonably imply to the defendants' audience that the plaintiff committed the crime. *Pate*, 959 S.W.2d at 574. The court rejected the premise that facially neutral words are immune from defamation liability when their context makes them directly capable of conveying a false, defamatory meaning. *Id.*

Snow's publication of his fabricated story about Harpole on Owens' show readily clears the threshold for plausibly conveying a defamatory meaning. Snow supplied his account about

Harpole's supposed suspicious activity before the assassination to Owens, intending for her to publicize it on her show as part of her "investigation" into the supposed true culprits behind Kirk's assassination. Snow then appeared on her show to further publicize his story after she had made other accusations against Harpole's conduct related to the assassination previously and claimed that Kirk had been "set up." ECF No. 1 ¶¶ 23–27, 30–33. By the time of the December 18 interview, Owens had already presented the story Snow had shared with her on their December 8 phone call as "SHOCKING information" involving "[Kirk's] security detail, Brian Harpole" and described the meeting at Fort Huachuca as the type of meeting held in an isolated location when an "operation is being confirmed." *Id.* ¶¶ 38–41.

An ordinary listener could understand Snow's story, shared in this context, to insinuate that Harpole was part of the supposed assassination plot that Owens had been investigating. This is precisely how members of Owens' audience interpreted it, as shown by their comments demonstrating they understood Snow's story to connect Harpole to Kirk's assassination. ECF No. 1 ¶¶ 43, 57–58. As in *Pate*, Snow's statements about Harpole, made in the context of an "investigation" into the conspiracy behind the Kirk assassination gave his identification of Harpole an obvious defamatory, criminal implication.

Snow's reference to a possible look-alike does not dispel the defamatory implication. In the December 18 interview, Snow insisted that someone matching Harpole's mannerisms and physical characteristics "definitely" walked past him. ECF No. 33 at 11; ECF No. 1 ¶¶ 51, 129. Snow then supplied reasons to credit his identification, including his "gift for recognizing people" and his observation that "someone with the same mannerisms, same crick in his neck, face, waxy look on his face, hand gestures, [] shoulder shrug, gait, approximate height, [and] haircut" as

Harpole "definitely walked past [him]" at Fort Huachuca. ECF No. 1 ¶ 51. That detailed description gave the audience reasons to believe his identification, not doubt it.

Snow similarly relies on his statement that he was "95 to 99" percent confident that the person he saw was Harpole. ECF No. 33 at 11; ECF No. 1 ¶¶ 52, 129. But that qualification reinforced Snow's near certainty in his identification of Harpole. A reasonable listener could (and would) understand a "95 to 99" percent confidence level as effective certainty, not as a meaningful retraction or hedge.

Finally, Snow's reliance on his statement that he did not know that Kirk would be assassinated the following day when he saw Harpole at Fort Huachuca is a non sequitur. ECF No. 33 at 11. That statement describes Snow's claimed lack of foreknowledge about the Kirk assassination on September 9. It does not determine whether his December publication could convey a defamatory implication that Harpole had attended a Fort Huachuca meeting connected to the Kirk assassination. The Complaint therefore alleges statements reasonably capable of a defamatory meaning.

**B. The Complaint pleads the required fault.**

Snow further claims that Harpole fails to allege that Snow acted with actual malice. This argument fails both because Harpole is a private figure who only needs to prove Snow acted with negligence and because Harpole's allegation that Snow knowingly fabricated his defamatory story satisfies the actual malice standard.

**i. The pleaded facts do not make Harpole a limited-purpose public figure.**

Snow's claim that Harpole is "at least a limited-purpose public figure" relies on Harpole's security role for Kirk on the day of the assassination and two later podcast interviews Harpole did to dispel defamatory accusations. ECF No. 33 at 14; ECF No. 1 ¶¶ 28–29. But the Complaint alleges that Harpole is a private individual with no regular public platform, did not seek publicity

about the assassination generally, and participated in only those two interviews for the limited purpose of answering defamatory accusations that had already been directed at him. ECF No. 1 ¶¶ 28–29. These allegations do not establish public-figure status as a matter of law.

A limited-purpose public figure must voluntarily "thrust [himself] to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Charles v. McQueen*, 693 S.W.3d 262, 274 (Tenn. 2024) (quoting *Press, Inc. v. Verran*, 569 S.W.2d 435, 439 (Tenn. 1978)). Both the public controversy at issue and the plaintiff's active role as a public figure seeking out a platform in that controversy must predate the statements tarring his reputation. *Id*. (citing *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 18 (1st Cir. 2011)). Defendants cannot "create their own defense … by making the claimant a public figure" through their challenged statements. *Id.* at 278 (quoting *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979)). Nor does a person become a public figure merely by being drawn into a public controversy against his will. *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 166–67 (1979).

The chronology in Harpole's Complaint shows that Harpole did not voluntarily participate in the controversy Owens manufactured over the Kirk assassination: he was dragged into it by Owens. Owens began accusing Kirk's staff and security team, which included Harpole, of responsibility for Kirk's death before Harpole's first interview. ECF No. 1 ¶¶ 23–28. It was only after weeks of Owens' defamatory insinuations and accusations that Harpole participated in the first interview on November 17, 2025—which was limited to responding to accusations and insinuations about his culpability for Kirk's death. *Id*. ¶¶ 28–29. Those accusations and insinuations came from Owens (perhaps not by name) and similar-minded conspiracy theorists.

Owens responded to the interview by escalating her attacks against Harpole, making new defamatory statements focused on Harpole's personal responsibility for Kirk's death. *Id*. ¶¶ 30–

33. In response, Harpole gave his only other interview on November 25, again limited to rebutting defamatory accusations originated by Owens. *Id.* ¶¶ 28–29. These two interviews were Harpole's only public comments on the Kirk assassination before Snow's December 2025 statements, and Harpole has made no further public comments since. Although the interviews predated Snow's statements, Harpole's limited, defensive responses to Owens' defamatory accusations cannot bootstrap Harpole into public-figure status when he otherwise did not voluntarily assume a prominent role in the controversy or seek to shape its outcome.

Nor is Harpole otherwise a limited-purpose public figure. Under *McQueen*, the essential question is whether the plaintiff voluntarily exposed himself to increased reputational risk by assuming a prominent role in a public controversy and possessed effective opportunities for rebuttal such that applying the actual malice standard to him would accord with the Supreme Court's rationale in *Gertz*. 693 S.W.3d at 274–75. In *McQueen*, the Tennessee Supreme Court found the plaintiff to be a limited-purpose public figure because he voluntarily became the face of a disputed development proposal and assumed public-facing roles—including as president of a homeowners' association related to the development—in which capacity he led meetings, interacted with officials, communicated with residents, and had regular access to media. *Id.* at 275–78.

Harpole's alleged role here is materially different. The Complaint does not allege that Harpole led the public debate over who was responsible for Kirk's assassination, sought a continuing platform, or enjoyed regular access to effective channels to communicate his perspective. It alleges that Harpole engaged in only two defensive podcast appearances one week apart after Harpole had already been involuntarily named in the controversy by Owens' defamatory accusations and that he neither sought nor held any continuing role commenting on the issue. ECF

No. 1 ¶¶ 28–29. That limited conduct does not resemble the voluntary and extensive participation that drove the limited-purpose public figure finding in *McQueen*.

Snow's argument for Harpole's limited-purpose public figure stands on nothing more than Harpole's two limited-scope interviews rebutting defamatory accusations already made against him. Snow cannot recast the nature of those interviews to claim Harpole chose to assume and hold a public commentary role he did not. Accepting Harpole's allegations regarding the interviews as true, Harpole remained a private figure and negligence is the governing fault standard for Harpole's defamation claim against Snow. *See McQueen*, 693 S.W.3d at 274–75; ECF No. 1 ¶¶ 28–29.

**ii. Nonetheless, Harpole plausibly pleads actual malice.**

Even if Harpole were a limited-purpose public figure, his claim survives. Actual malice means knowledge of falsity or reckless disregard for truth. *McQueen*, 693 S.W.3d at 280. It may be inferred when a story is so inherently improbable that only a reckless person would circulate it. *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). "[W]here a story is fabricated by the defendant, is the product of his imagination [or] is the product of his imagination," actual malice is satisfied. *Id*. Harpole expressly alleges that Snow knew his account was false because he fabricated the supposed firsthand encounter with Harpole at Fort Huachuca. ECF No. 1 ¶¶ 127, 135, 141.

Harpole supports his claim that Snow knowingly fabricated his story with specific alleged facts. Snow's account depends on his personal knowledge of a facially outlandish series of events: although Snow is a Washington civilian, he claims he (somehow) found his way onto the secure Army installation at Fort Huachuca near the Mexican border and (somehow) inadvertently joined a classified meeting among high-ranking military officials and a congressmen, where he identified Harpole, and (somehow) avoided subsequent arrest and prosecution. ECF No. 34 ¶ 3; ECF No. 33 at 10; ECF No. 1 ¶¶ 36, 51–52, 127–35. Because Snow presents himself as the eyewitness source

for his story, he necessarily knew the story was false if, as Harpole alleges, its events never happened.

Harpole further alleges that there is no factual basis for Snow's story: Harpole has never been to Fort Huachuca and travel records place him in Dallas on September 9, 2025. *Id.* ¶ 42. Those facts reinforce the pleaded inference that Snow knowingly fabricated his story or, at minimum, spread it with reckless disregard for the truth. Harpoles' allegations therefore satisfy both actual malice and the lesser negligence standard.

**C. The Complaint pleads publication and actual injury.**

Finally, Harpole adequately pleads damages from Snow's publication of his defamatory statements. Harpole alleges Snow's publication of his statements both in his December 8 call to Owens and his December 18 interview on her show, and alleges that the related tortious acts damaged his reputation professionally and personally, harmed him financially, cost him business opportunities, and caused emotional distress. ECF No. 1 ¶¶ 127–37, 150, 152–53. Actual injury is not limited to out-of-pocket loss; impairment of reputation, humiliation, and mental anguish may qualify. *Hibdon v. Grabowski*, 195 S.W.3d 48, 68 (Tenn. Ct. App. 2005) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349–50 94 S. Ct. 2997, 3012 (1974)). Snow's demand for a named client or quantified loss therefore seeks evidentiary detail beyond what is required.

**III. The Complaint states a civil-conspiracy claim.**

Civil conspiracy requires "(1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703 (Tenn. 2002). A conspiracy claim is a vehicle for imposing liability on each conspirator for damages caused in furtherance of the common design; it does not

require each conspirator personally to commit every tortious act. *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 67 (Tenn. 2001).

**A. The pleaded facts permit an inference of agreement between Snow and Owens.**

Snow argues that Harpole's conspiracy claim fails because Harpole alleges no express words of agreement, division of roles, or on-air bargain between Snow and Owens. ECF No. 33 at 16. Tennessee law requires none of those things: a tacit agreement may be inferred from the parties' conduct, relationship, interests, and the surrounding circumstances. *Stanfill v. Hardney*, No. M2004-02768-COA-R3-CV, 2007 Tenn. App. LEXIS 620, at *25–26 (Ct. App. Sep. 27, 2007). "[I]t is not essential that each conspirator have knowledge of the details of the conspiracy. *Brown*, 42 S.W.3d at 67.

The question at this stage is whether the pleaded facts permit a reasonable inference that Snow and Owens understood the plan's general objective and each agreed to further it. *Stanfill*, No. M2004-02768-COA-R3-CV, 2007 Tenn. App. LEXIS 620, at *26. Direct evidence is unnecessary because "[c]onspiracies, by their very nature, are formed in secret," making it "unlikely that direct evidence of a conspiratorial agreement will exist." *Id.* at *25. Harpole's allegations provide ample circumstantial basis to infer an agreement and identify the communication in which Snow and Owens' agreement was allegedly made.

First, Harpole alleges that Snow and Owens spoke on December 8 about Snow's Fort Huachuca account, during which conversation they agreed to disseminate Snow's defamatory story through Owens' media operation for their mutual benefit. ECF No. 1 ¶¶ 140–42. Their ensuing conduct supports that allegation. On December 9, Owens broadcast Snow's story as salacious information involving Harpole that would "shock your senses," teased that it would blow her audience's mind and lead to "a full confession from the government about the military's involvement in [the Kirk] assassination," and promoted it across her platforms. *Id.* ¶¶ 35–36. Snow

and Owens then arranged his December 18 interview, during which Owens set Snow up to repeat his defamatory story at length and assisted him in asserting that he was near-certain in his identification of Harpole at Fort Huachuca. *Id*. ¶¶ 51–52. This sequence permits an inference of coordinated publication, not merely parallel conduct.

Second, the pleaded financial motives bolster that inference. Owens allegedly had a financial incentive to publicize sensational content that drew attention. ECF No. 1 ¶¶ 11, 14–19, 142. Her later announcement that she would raise funds for Snow provides additional circumstantial support for a mutual-benefit arrangement. *Id*. ¶ 52.

Snow's observation that no bargain was negotiated on air during his December 18 interview therefore misses Harpole's pleaded theory regarding the origin of the agreement. The Complaint places the start of the agreement in the private December 8 call and relies on ensuing conduct as evidence. ECF No. 1 ¶¶ 140–48.

**B. Each conspirator is liable for acts in furtherance of the common design.**

Snow argues that he cannot be liable for damages for statements made by Owens. ECF No. 33 at 15, 17. But once a civil conspiracy is established, "each conspirator is liable for the damage caused by the other" in executing the common design. *Brown*, 42 S.W.3d at 67. Conspiracy thus extends tort liability to those who planned, assisted, or encouraged the active wrongdoer. *Id.*

Harpole alleges the required overt acts: Snow gave his defamatory story to Owens for publication during their call on December 8; both Snow and Owens knew Snow's story was false or acted with reckless disregard for the truth before publicizing it; Owens published and promoted Snow's account beginning December 9; Owens and Snow coordinated and conducted the December 18 interview to further promote and bolster Snow's story; and Owens continued promoting Snow's defamatory story afterward. ECF No. 1 ¶¶ 140–48. Harpole further alleges

reputational, business, and emotional injury resulting from those defamatory overt acts. ECF No. 1 ¶¶ 79–80, 143–48, 150. Harpole's allegations thus satisfy the overt act and injury elements.

Finally, Snow is mistaken in suggesting that Harpole relies on his defamation claim's negligence allegation for his conspiracy claim. ECF No. 33 at 17. Harpole's conspiracy claim rests on allegations that Snow knowingly fabricated his story, knowingly supplied it to Owens for publication, and agreed with Owens to use her network to promote its defamatory insinuations. ECF No. 1 ¶¶ 135, 140–48. Those allegations supply the knowing common design required for conspiracy.

**D. The underlying defamation torts against Snow and Owens are adequately pleaded.**

The underlying torts for Harpole's conspiracy claim are adequately pleaded as well. For the reasons above, Snow's own statements are reasonably capable of defamatory meaning and were published with the requisite fault. *Supra* at II. Harpole separately alleges that Owens committed actionable defamation in furtherance of the common design.

**i. Harpole adequately alleges that Owens defamed him.**

Owens not only published Snow's defamatory story; she made additional statements based on it that strengthened the defamatory insinuation that Harpole was involved in the Kirk assassination. It was Owens who stated on her December 9 show that the purported Fort Huachuca meeting was the type held "ahead of an operation" because "[w]hen an operation is being confirmed, you have these final meetings, and they involve all the higher-ups and you are trying to do this in a very isolated location where you know people are not going to accidentally happen upon you[.]" ECF No. 1 ¶ 38. It was Owens who had the description for her December 9 episode state that Snow's story should lead to "a full confession from the government about the military's involvement in [Charlie Kirk's] assassination …." *Id*. ¶ 40. It was Owens who repeatedly accused

Harpole of lying about his efforts to save Kirk's life after she had publicized Snow's story insinuating that Harpole was part of an assassination plot. *Id*. ¶¶ 45, 47.

For the December 18 interview, Owens explicitly framed both the interview and Snow's story as connected to the Kirk assassination. *Id*. ¶¶ 49–50. During the interview, Owens elicited details designed to reinforce the story's credibility and expressly adopted and endorsed its accuracy and probative value. *Id*. ¶¶ 51–52. Following the interview, Owens falsely claimed to have evidence confirming Snow's story—evidence that neither she nor Snow has produced.

Following her publication of Snow's story, Owens repeatedly pressured Harpole to respond to the defamatory accusations, thereby enabling her to profit from exclusive content. *Id*. ¶¶ 54–55, 59. Owens then misrepresented Harpole's refusal to engage with her cynical tactics as a further basis to insinuate his involvement in the assassination. *Id*. Owens then falsely claimed to have travel logs for Harpole (which she has never produced) that corroborated Snow's story. *Id*. ¶ 60. Harpole's actual travel logs show the opposite: he was in Texas on September 9, not Arizona. *Id*. ¶¶ 42, 56. Owens also published a screenshot of what she purported to be an incident report from Snow's visit to Fort Huachuca, even though it was facially not an official document and could not reasonably support Snow's outlandish story. *Id*. ¶¶ 63–64. These allegations describe a consistent campaign by Owens to convince the audience that Snow's story was true and to spread its defamatory insinuations. Audience comments demonstrate that listeners understood the statements to connect Harpole to Kirk's assassination. *Id*. ¶¶ 43, 57–58.s

As to Owens' intent, Harpole sufficiently alleges that Owens acted with actual malice, although negligence should apply for the reasons stated above. *See supra* at II(B)(i).

First, Harpole's allegation that Owens knowingly or recklessly published Snow's story is supported by the story's facial absurdity, her acknowledgment that Snow was its only source, and

thousands of comments pointing out gaps in it. ECF No. 1 ¶ 94. Those allegations support the inference that Snow's claims were "so inherently improbable that only a reckless man would have put them in circulation." *St. Amant*, 390 U.S. at 732 ("[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the information or the accuracy of his reports.").

Second, Harpole's allegations support the inference that Owens fabricated multiple defamatory claims based on Snow's story. She affirmatively misrepresented Harpole's travel records, claiming that Harpole could have attended the Fort Huachuca meeting even though the evidence she claimed to possess placed him in Texas at that time. ECF No. 1 ¶ 94. She also presented the alleged "incident report" as support for Snow's story, even though it was obviously not an official document and of suspect origin. *Id*. And she continued promoting the story while admitting that she could not verify whether the meeting happened or whether Harpole was there. *Id*. Snow's motion itself attributes several statements that furthered the story's defamatory implications solely to Owens. ECF No. 33 at 11–12, 16; ECF No. 33-1 (Snow stating that "Owens later states her own broader conclusions concerning government involvement and a cover-up" after he left the December 18 interview). A reasonable inference is therefore available that Owens personally fabricated at least some of the evidence she used to support the credibility of Snow's story and at least some of the defamatory statements she published supposedly based on it.

Based on the foregoing, Harpole sufficiently alleges that Owens acted with actual malice, whether by knowingly publishing fabricated defamatory statements about Harpole or by spreading them despite having no competent corroborating evidence and every reason to doubt them.

Harpole's allegations thus satisfy the conspiracy requirement of a well-pleaded underlying tort. Harpole plausibly alleges a common design between Snow and Owens, defamatory

publications in furtherance of that design, and resulting injury. The civil-conspiracy claim should not be dismissed.

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendant Snow's motion to dismiss in its entirety. Should the Court determine that the personal jurisdiction issue cannot be resolved on the written pleadings, the Court should grant Harpole jurisdictional discovery into relevant issues concerning Snow's contacts with Tennessee and the conspiracy among Snow and the other Defendants prior to any decision to dismiss Harpole's claim without prejudice.

Respectfully submitted,

*/s/ Jacob William Roth*

Jacob William Roth*
CONTARINO ROTH LLC
2255 Glades Road, Suite 324A
Boca Raton, FL 33431
Tel: 561.872.6508
jroth@contarinoroth.com

Matthew Seth Sarelson, Esq.
DHILLON LAW GROUP INC.
1601 Forum Place, Suite 202
West Palm Beach, Florida 33401
Tel: 305.773.1952
msarelson@dhillonlaw.com

THE SWAFFORD LAW FIRM, PLLC
Tara L. Swafford, BPR # 17577
Elizabeth G. Hart, BPR # 30070
321 Billingsly Court, Suite 19
Franklin, TN 37067
Tel: (615) 599-8406
Fax: (615) 807-2355
tara@swaffordlawfirm.com
betsy@swaffordlawfirm.com

Attorneys for Plaintiff Brian Harpole
**Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2026, I filed the document via CM/ECF, which will serve the document on all Defendants or their counsel via email.

*/s/ Jacob William Roth*
Jacob William Roth