IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| BRIAN HARPOLE,<br><br>Plaintiff,<br><br>v.<br><br>CANDACE OWENS, et al.,<br><br>Defendants. | Case No. 3:26-cv-00556<br><br>District Judge: William L. Campbell, Jr.<br>Magistrate Judge: unassigned<br><br>JURY DEMAND |

**PLAINTIFF BRIAN HARPOLE'S RESPONSE IN OPPOSITION TO OWENS DEFENDANTS' MOTION TO DISMISS, TPPA PETITION, AND MOTION TO STRIKE**

Plaintiff Brian Harpole submits this response in opposition to ECF No. 31 (the "Motion"), filed by Defendants Candace Owens, Candace Owens LLC, and GeorgeTom, Inc. (collectively, the "Owens Defendants"). The Motion seeks partial dismissal under Federal Rule of Civil Procedure 12(b)(6) and the Tennessee Public Participation Act ("TPPA"), attorney's fees under the TPPA, and relief under Rule 12(f). For the reasons below, the Motion should be denied.

## INTRODUCTION

On September 10, 2025, Charlie Kirk was publicly assassinated during a public event at Utah Valley University ("UVU") when Tyler Robinson shot him from a rooftop with a rifle. Robinson turned himself in the next day and has admitted guilt.[1] Despite Robinson's clear guilt, Defendant Owens, perhaps America's most high-profile and financially successful conspiracy theorist, seized the Kirk assassination as an opportunity to profit from tragedy by positioning herself as the leading truther about the "real" identity of Kirk's assassin. *See* ECF No. 1 ¶ 22.

[1] Matthew Brown, *Defense in Charlie Kirk's killing say shooter should get death penalty, hit 'intended target'*, Associated Press (Aug. 12, 2026), https://apnews.com/article/charlie-kirk-assassination-death-penalty-tyler-robinson-2e486bce004797c86f0bab4533a96a6f.

Owens rapidly began promoting conspiracy theories about complex plots behind the crime on her daily show, spreading evidence-free accusations that Kirk was betrayed by those closest to him in collaboration with secret government conspiracies. *Id.* ¶¶ 22–27, 32.

Owens repeatedly focused her conspiracy theories on Mr. Harpole and his security team. UVU was primarily responsible for security at the event on its campus where the assassination took place, but Mr. Harpole oversaw a limited portion of the security arrangements on behalf of Turning Point USA. *Id.* ¶ 4. Owens targeted Mr. Harpole with various false and defamatory accusations that he was responsible for Kirk's death, both deliberately and through specific acts of gross incompetence in his security and emergency-response role.

Owens' accusations included false assertions that Mr. Harpole was personally responsible for particular alleged lapses in security and emergency-medical arrangements that contributed to or caused Kirk's death and that he had lied about them, that Mr. Harpole was a proven liar about the Kirk assassination, that he never called 911 and never gave Kirk emergency medical aid after the shooting, that he and his team participated in a coverup of the crime scene, and that he had specific foreknowledge that Kirk would be assassinated on September 10 and expected it to happen. *Id.* ¶¶ 25–27, 30–33, 45–47, 71–75.

Owens also coordinated with Defendant Snow to spread an outlandish conspiracy theory he originated that fit with the false claims about the Kirk assassination that Owens was already monetizing. *Id.* ¶¶ 36, 127–128. Snow, a civilian who lives in Washington, claimed to have somehow found his way onto the secure U.S. Army installation at Fort Huachuca, Arizona the day before the Kirk assassination, where he saw someone he was certain was Harpole participating in a top-level secret military meeting. *Id.* ¶¶ 34–39, 127–130. There is no corroborating evidence for this story, and Mr. Harpole directly alleges that Snow's entire story is false and was willfully

fabricated by Snow and Owens, with travel records showing Mr. Harpole was in Texas on the day in question. *Id*. ¶¶ 42, 53, 55–57, 90, 94, 127–129, 132, 135. Mr. Harpole alleges that Snow and Owens agreed during a conversation on December 8, 2025, to a conspiracy to defame Mr. Harpole for their mutual profit, which they put into practice through Owens' posts publicizing his story as true and through an interview Owens conducted with Snow to validate and promote the story on December 18.

Based on Owens' statements falsely accusing Mr. Harpole of complicity in Kirk's murder or contributing to it happening, Mr. Harpole brought the present action against the Owens Defendants for defamation, false light, and conspiring with and aiding and abetting Snow in spreading the defamatory Fort Huachuca conspiracy.

The Owens Defendants now seek dismissal of Mr. Harpole's defamation and false light claims based on statements *other* than those about Fort Huachuca, and the conspiracy and aiding and abetting claims. Regarding Owens' defamatory statements at issue in the Motion, they claim that Owens' various statements other than those about Fort Huachuca are incapable of defamatory meaning because they are protected opinion, mere questions, or substantively truthful. They further claim that the defamation and false light claims fail because Mr. Harpole is a limited-purpose public figure and has failed to sufficiently plead that they acted with actual malice, that he has not sufficiently pleaded harm causally connected to her statements, and that the false light claim is impermissibly duplicative of the defamation claim. Regarding the conspiracy and aiding-and-abetting claims, the Owens Defendants claim that Mr. Harpole has not alleged they acted with sufficient intent, and that he has not sufficiently pleaded the existence of a conspiratorial agreement between the Owens Defendants and Snow.

None of the Owens Defendants' arguments are availing.

First, Owens' challenged statements are all capable of defamatory meaning based on their content and context. Owens' statements asserted or insinuated the existence of false verifiable facts about specific actions or omissions by Mr. Harpole that a reasonable audience member could interpret as making him responsible for Kirk's death.

Second, Mr. Harpole is not a limited-purpose public figure. He is a private figure who had no public profile prior to the Kirk assassination and the false conspiracy theories that the Owens Defendants and others spread about him. His limited defensive response to these defamatory accusations in two interviews did not change that.

Third, there is a sufficient basis to infer that the Owens Defendants acted with actual malice based on Owens' knowingly false accusations against Mr. Harpole, the absence of evidence or sources for her claims, the inherently improbable nature of her claims, her refusal to seek comment or confirmation from him before making her accusations, her familiarity with evidence and information that contradicted her claims, and her business model of spreading absurd conspiracy theories for profit.

Fourth, Mr. Harpole has sufficiently pleaded that Owens' challenged statements caused him financial, reputational, and emotional harm, and caused him to lose business opportunities.

Fifth, Mr. Harpole has directly alleged that the Owens Defendants conspired with Snow and assisted him in knowingly spreading a false and defamatory conspiracy theory about Fort Huachuca, and has pleaded ample circumstantial evidence to support an inference of their agreement to a conspiracy, including the coordinating communications between Owens and Snow, Owens' deliberate promotion of her false story despite possessing evidence contradicting it, and their mutual profit motive.

Finally, the Owens Defendants wrongly claim that the special dismissal procedures and fee-shifting provisions of Tennessee's anti-SLAPP law, the TPPA, apply to this matter. Courts in the Sixth Circuit have repeatedly addressed this issue and have consistently refused to apply the TPPA in federal proceedings because it conflicts with the federal rules.

The Motion should be denied in its entirety accordingly.

## ARGUMENT

### I. Preliminary Matters: the evidence attached to the Owens Defendants' Motion, the inapplicability of TPPA procedures, and the availability of injunctive relief.

#### A. On a Rule 12 motion, the Court cannot consider the podcast transcripts made by the Owens Defendants to support their Motion.

Attached as exhibits to the Motion are seven transcripts the Owens Defendants prepared for episodes of Owens' podcast and Mr. Harpole's two interviews. *See* ECF Nos. 31-1 through 31-7. They total 582 pages. Rule 12(b)(6) requires the Court to accept well-pleaded facts as true, draw reasonable inferences in Mr. Harpole's favor, and ask whether they state a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Exhibits attached to a Rule 12 motion may be considered when they have been referred to in the complaint and are central to its claims. *Bassett v. National Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). But a defendant may not use materials central only to its defense to replace the pleaded facts with its own account. *Blackwell v. Nocerini*, 123 F.4th 479, 486–88 (6th Cir. 2024). While the underlying podcasts and interviews were referred to in the Complaint, the Owens Defendants' transcripts were not: the Owens Defendants commissioned them to use with their Motion. Their accuracy, which is an evidentiary matter for the court to resolve absent a stipulation by the parties, has not been verified. *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir. 1983). The transcripts are thus inappropriate for the Owens Defendants to use on a motion to dismiss to the extent they conflict with Mr. Harpole's allegations.

Mr. Harpole cites to the transcripts below solely for the purpose of argument as admissions by the Owens Defendants about Owens' defamatory statements. This does not warrant accepting the transcripts as generally true or allowing them to override the allegations in the Complaint. If the Court considers additional matter outside the recognized pleading exceptions, Rule 12(d) requires conversion to a motion for summary judgment and a reasonable opportunity for Mr. Harpole to present pertinent material. Mr. Harpole requests exclusion of such material at this stage rather than premature conversion before a full evidentiary record has been developed.

**B. The TPPA's special dismissal and fee-shifting procedures do not apply in federal court.**

The Owens Defendants claim that the TPPA's dismissal and fee-shifting provisions[2] apply in federal court because they do not conflict with the Federal Rules. Mot. at 4–5, 30–31. Courts in this District have consistently rejected that position. *See Patriot Angels Consulting Corp. v. VFW of United States*, No. 3:24-cv-00087, 2026 U.S. Dist. LEXIS 45416, at *43 (M.D. Tenn. Mar. 5, 2026); *Mucerino v. Martin*, No. 3:21-cv-00284, 2021 U.S. Dist. LEXIS 228340, at *16–18 (M.D. Tenn. Nov. 30, 2021); *Santoni v. Mueller*, No. 3:20-cv-00975, 2022 U.S. Dist. LEXIS 4336, at *32–33 (M.D. Tenn. Jan. 10, 2022); *see also Hughes v. Gupta*, 613 F. Supp. 3d 1054, 1056–58 (W.D. Tenn. 2021). The Court should follow those decisions.

A state anti-SLAPP procedure cannot displace valid Federal Rules addressing the same question. *Hughes*, 613 F. Supp. 3d at 1058; *see also Berk v. Choy*, 607 U.S. 187, 192 (2026) ([A] valid Rule of Civil Procedure displaces contrary state law even if the state law would qualify as substantive under Erie's test."). The TPPA requires a plaintiff, once the petitioner meets its threshold burden, to establish a prima facie case for every essential element using admissible

[2] The Owens Defendants concede that the TPPA's statutory discovery stay and interlocutory-appeal provisions conflict with federal procedure. Mot. at 5 n.1.

evidence. Tenn. Code Ann. § 20-17-105(a), (b), (d). By contrast, Rule 12 tests the sufficiency of the complaint under a plausibility standard based only on its allegations. Consideration of outside material beyond the recognized exceptions is not permitted unless the court converts the motion under Rule 12(d)—which in turn provides the protections and standards of Rule 56. Unlike the TPPA, Rule 56 does not require discovery to be closed in every case and instead requires that the parties have an opportunity to present pertinent material and allows them to seek necessary discovery. *See* Fed. R. Civ. P. 56(d). The TPPA thus imposes burdens that conflict with both Rule 12 and Rule 56. That conflict, in addition to TPPA's discovery stay, is why the TPPA's special dismissal mechanism cannot govern this action. *See Mucerino*, No. 3:21-cv-00284, 2021 U.S. Dist. LEXIS 228340, at *16–18. The Owens Defendants identify no controlling Sixth Circuit decision requiring a different result.

The Owens Defendants' related fee request fails as well. Section 20-17-107(a) of the TPPA authorizes an award when the court dismisses a legal action pursuant to a TPPA petition. Because the TPPA's special dismissal mechanism does not apply in federal court, the Court cannot dismiss Mr. Harpole's claims under the TPPA—only under Rule 12, which does not trigger the TPPA's fee-shifting provision.

If the Court concludes that the TPPA's procedures do apply, Mr. Harpole requests an opportunity to submit evidence under § 20-17-105(d) and to seek specified discovery for good cause under § 20-17-104(d) before disposition under the TPPA.

### C. Narrowly tailored injunctive relief is available to prohibit defamatory statements that are adjudicated false.

The Owens Defendants blatantly mischaracterize Mr. Harpole's request for injunctive relief as a demand to compel speech. Mot. at 31–32. The Complaint does not request that Owens make a public apology or other forced statement—it only requests that the Court "[i]ssues a

narrowly tailored permanent injunction requiring the removal of the defamatory statements from the Defendants' various social media accounts, and enjoining Defendants from republishing or reposting the deleted media and similar such statements in the future." Compl. at 68, Prayer ¶ ii.

The Sixth Circuit permits this kind of narrow injunction against continuing repetition of statements adjudicated false and defamatory. *Lothschuetz v. Carpenter*, 898 F.2d 1200, 1206, 1208–09 (6th Cir. 1990) (Wellford, J., stating the court's holding on injunctive relief, joined by Hull, J.). For its part, Tennessee follows the "modern rule" permitting similarly limited injunctive relief after a determination that the challenged statements are false. *In re Conservatorship of Turner*, No. M2013-01665-COA-R3-CV, 2014 WL 1901115, at *20 (Tenn. Ct. App. May 9, 2014).[3] These decisions defeat the Owens Defendants' categorical claim that such injunctive relief is unavailable, and they explicitly authorize the narrowly tailored injunctive relief Mr. Harpole seeks.

## II. The challenged statements are capable of defamatory meaning in context.

The Owens Defendants contend that Owens' challenged statements, aside from those about Fort Huachuca, are incapable of defamatory meaning because they are, variously, non-actionable opinion or hyperbole, substantially true, or otherwise incapable of conveying a defamatory meaning about Mr. Harpole. Their arguments fail because Owens' challenged statements, when

---

[3] *See also Gider v. Hubbell*, No. M2016-00032-COA-R3-JV, 2017 Tenn. App. LEXIS 211, at *33 (Ct. App. Mar. 29, 2017) (defamatory remarks can be enjoined because they are not protected speech); *Kauffman v. Forsythe*, No. E2019-02196-COA-R3-CV, 2021 Tenn. App. LEXIS 206, at *15 (Ct. App. May 25, 2021) ("Injunctions against defamatory speech are permissible in Tennessee."); *see also Church of God in Christ, Inc. v. Tyson*, No. 2:25-cv-03029-MSN-cgc, 2026 LX 457398, at *16 (W.D. Tenn. Aug. 5, 2026) (recognizing that an injunction can be "necessary to prevent future injury to [] personal reputation and business relations"); *Mid-Am. Apartment Cmtys., Inc. v. Philipson*, No. 2:23-cv-02186-SHL-cgc, 2024 U.S. Dist. LEXIS 48324, at *19 n.11 (W.D. Tenn. Mar. 19, 2024) ("[N]arrow injunctions against false and defamatory speech are permissible without contravening the First Amendment's general prohibition on prior restraints.").

evaluated in context and under applicable law, all communicate false factual statements about Mr. Harpole's specific actions or omissions that a reasonable audience member could interpret as meaning that Mr. Harpole was personally responsible for Kirk's assassination. Compl. ¶¶ 83–92, 100–08.

The Court must determine whether a reasonable viewer of Owens' statements, considering each communication as a whole and its surrounding circumstances and "broader social context," could interpret them as conveying a false, reputation-damaging factual assertion about Mr. Harpole. *Grant v. Commer. Appeal*, No. W2015-00208-COA-R3-CV, 2015 Tenn. App. LEXIS 750, at *30–31 (Ct. App. Sep. 18, 2015), *abrogated on other grounds by Funk v. Scripps Media, Inc.*, 570 S.W.3d 205 (Tenn. 2019). The Owens Defendants' labeling her statements as opinion does not protect them if they could be reasonably interpreted as implying provably false facts. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–21 (1990).[4] Likewise, questions can be actionable if they could be reasonably understood to assert false facts. *Grant*, No. W2015-00208-COA-R3-CV, 2015 Tenn. App. LEXIS 750, at *31–32.[5]

The defamatory nature of Owens' specific statements is addressed below.

---

[4] *Id.* at 18–19 ("If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.'").

[5] The Owens Defendants claim that a question can never be defamatory as a matter of law. Mot. at 11. This claim is false and their own cited authorities reject it. *See Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1338 n.7 (D.C. Cir. 2015) ("To be sure, as Judge Sack notes and as case law bears out, questions that contain embedded factual assertions may sometimes form the basis for a successful defamation claim."); *Partington v. Bugliosi*, 56 F.3d 1147, 1157 (9th Cir. 1995) ("A question can conceivably be defamatory, though it must reasonably be read as an *assertion* of a false *fact*.").

### A. Owens' claim that Mr. Harpole should be fired because he lied about rooftop security and drone availability.

The Owens Defendants argue that Owens' assertions that Mr. Harpole should be fired because he lied about failing to provide rooftop security and about drone availability are not actionable because they are disconnected statements of opinion. Mot. at 9–10. This argument mischaracterizes her statements and improperly considers them in isolation. In context, they can be reasonably understood as verifiably false defamatory assertions that Mr. Harpole engaged in specific acts and omissions that contributed to Kirk's assassination and make Mr. Harpole professionally unfit.

The Owens Defendants isolate Owens' assertion that Mr. Harpole should be fired for incompetence from the false factual statements she made to justify it. Mot. at 9–11. The Complaint alleges that Owens asserted on her November 18 and 19, 2025, podcast episodes that Mr. Harpole should be fired because he lied about the availability of drones for security and failed to ensure rooftop security on the day of the Kirk assassination. Compl. ¶¶ 30–33. In the November 18th episode transcript, Owens repeatedly attributes the rooftop communications with the university chief of police and supposed lack of follow-up to Mr. Harpole personally instead of Dan Flood. ECF No. 31-4, 21:1–23:1. The Complaint alleges that Owens' attribution was false: Dan Flood handled the communications with the police chief and Mr. Harpole was not involved in them. Compl. ¶ 31.

Owens used that false assertion as a basis for her repeated statements that his team "should all be fired," and that Mr. Harpole "of course, [] should be fired." ECF No. 31-4, 22:8–23:1. In pairing her false statements about Mr. Harpole's responsibility for coordinating and deciding on rooftop security with the statements that Mr. Harpole should thus be fired, Owens provided a context for her false statements that a reasonable viewer could interpret to mean that Mr. Harpole

personally disregarded an identified security risk and caused lapses in security that represented gross professional incompetence and contributed to the Kirk assassination.

Owens followed her false statements about the rooftop arrangements with false accusations that Mr. Harpole lied about not being able to use drones at the September 10th event. Compl. ¶¶ 30–33. After playing a clip of Mr. Harpole's explanation of airspace restrictions and the allocation of police responsibilities, she suggested that Mr. Harpole was being "dishonest[]" and insinuated that he was withholding communications with the university that would show he had failed to take appropriate action, tying her insinuation of his dishonesty to her prior false statements that he was responsible for coordinating rooftop security with UVU's police chief. ECF No. 31-4, 25:3–11 ("Nor do I find him to be convincing, right? The vibe I'm getting from that interview is dishonesty. Okay. I'd like to see more of your conversation, not—this screenshot doesn't move anything other than that you started a conversation about the rooftop, that you were aware there was an open rooftop and didn't follow up in some measure."). Those remarks tied Owens' false accusation of dishonesty about drones to her false statements about rooftop security, making them a further basis for an audience member to interpret her as asserting that he engaged in incompetent conduct that contributed to Kirk's death.

Whether Mr. Harpole lied about rooftop security and drone availability and was responsible for specific security lapses regarding both that contributed to the assassination are factual matters capable of verification, not unprovable opinions. Owens herself encouraged her audience to interpret her false claims as meaning that Mr. Harpole's conduct contributed to Kirk's death by following them up with the rhetorical question, "is this how these assassinations happen?" Compl. ¶ 30; ECF No. 31-4, 24:17–18.

**B. Owens' assertion that Mr. Harpole's security team left Kirk unprotected like a "sitting duck" and forgot to have an ambulance ready.**

The Owens Defendants argue that Owens' statement that the security detail left Kirk "sitting like a sitting duck" and forgot an ambulance is not defamatory because the language is too loose and figurative to be construed as a representation of fact. Mot. at 11–12. This argument fails because a reasonable listener could understand Owens as making the false assertion that the security detail either deliberately or incompetently left Kirk exposed to danger without protective measures; her assertion that the security team forgot to have an ambulance can reasonably be understood as making the false assertion that an ambulance could have been arranged but was omitted by the security team deliberately or incompetently. The Complaint alleges those accusations are false. Compl. ¶¶ 21, 26, 102(a), 105–10. They convey a factual account of the security and emergency transport arrangements that is verifiably untrue and that would cause a reasonable listener to think that Mr. Harpole and his team contributed to or caused Kirk's death through their actions and omissions that Owens falsely attributed to them.

Owens' surrounding statements support this defamatory interpretation. Owens was responding to another commentator's criticism that her conspiracy theorizing about the Kirk assassination sounded like an Agatha Christie mystery rather than real life, insisting that her false claims of what occurred on the day of the Kirk assassination demonstrate that a conspiracy did occur because those things do not occur in "real life":

> And if you're looking for real life Agatha Christie stuff, in real life people's necks don't stop .30-06 bullets. In real life, that's all I'm saying. In real life when you spend millions of dollars on security, on your security detail, they don't have you sitting like a sitting duck and forget to have an ambulance behind you. In real life I worked for Turning Point USA, and I know what does not make sense in terms of the time line of how this event came together. And in real life, if somebody suspects you in a murder for any reason whatsoever and you can put something out publicly that will clarify a fact that isn't correct if you say it's not correct, you would do that. You wouldn't hide. In four seconds I would say, oh, the reason why I was on the phone with so-and-so had nothing to do with anything. So people are following

> their instincts because they should. I just want to remind you because it bothers me that that was Charlie's real life, okay?[6]

Because Owens made her accusations about Mr. Harpole and his team leaving Kirk exposed and not having an ambulance ready alongside claims that there were reasons to think people other than Robinson were behind the murder, a reasonable audience member could interpret her as attributing consequential professional failures to them or suggesting their involvement in foul play.

Owens did not have to name Mr. Harpole for her statements to be understood as concerning him. Tennessee law asks whether a reasonable recipient would and did understand the challenged communication to refer to the plaintiff. *Stones River Motors, Inc. v. Mid-South Publishing Co.*, 651 S.W.2d 713, 717–18 (Tenn. Ct. App. 1983). Extrinsic facts can identify an unnamed plaintiff. *Steele v. Ritz*, No. W2008-02125-COA-R3-CV, 2009 WL 4825183, at *3 n.5 (Tenn. Ct. App. Dec. 16, 2009). Here, the Complaint alleges that the security team Owens referred to was small and consisted of identifiable individuals, Mr. Harpole was the team's leader and present at the moment Kirk was shot, and audience members understood that accusations about the security team included him. Compl. ¶¶ 4, 21, 89, 104. Owens' statements addressed the small team's performance of its central task at a specific event, rather than a broad class of people generally. Those pleaded circumstances support the inference that audience members could and did connect Mr. Harpole with the identification.

### C. Owens' accusation that the security team engaged in "shady" conduct related to the crime scene based on her false accusation that they re-paved the area.

The Owens Defendants claim that Owens' accusation that the security team acted "shady" by releveling the ground where Kirk was shot soon after the assassination is protected opinion commentary. Mot. at 12. They ignore the full context and content of Owens' remarks, which would enable a reasonable viewer to interpret Owens as insinuating that Mr. Harpole and his team

---

[6] ECF No. 31-2, 28:14–29:1.

engaged in a coverup of the crime scene after the assassination. In her November 13th episode, Owens discussed a viewer's question about the security team's conduct after Kirk was shot, stating she had reviewed video footage and found it suspicious that she could not see what the security team was doing and that "they" put new pavers down after the assassination:

> What's compelling is when you can't see [the security team members] when they're on the ground. It's just not clear to me what they are doing there. And, of course, we know they then put down pavers almost immediately and releveled that area. So I do find that to be quite shady. I don't know what – what they were doing.[7]

In context, a listener could reasonably understand Owens' claim that "they then put down pavers" to refer to the security team she had just been discussing, falsely claiming that they were the ones who did the repaving, and could interpret Owens' assertion that this was "shady" as a false assertion that the security team participated in a cover-up of the crime scene. Compl. ¶¶ 21, 27, 78, 89. This interpretation is made more plausible because Owens made her false statement and accusation at the end of an episode in which she repeatedly insisted that there were dark conspiracies surrounding the assassination that needed to be uncovered.[8]

**D. Owens' claim that Mr. Harpole did not make security arrangements for Kirk's event at Charis Bible College because he had foreknowledge of the Kirk assassination and did not expect him to survive it.**

In Owens' podcast episode from January 8, 2026, she described a supposed tip from an unidentified person involved in planning Kirk's September 11, 2025, event at Charis Bible College, claiming she was told that there was no security plan or police coordination in place prior

---

[7] ECF No. 31-3, 44:23–45:4.

[8] *Id*. 35:8–12 ("We want to know who killed Charlie Kirk because this story seems pretty dark, it seems pretty deep. And everyone that should be using their platforms to try to get to the bottom of what happened to him ….."); *Id*. 25:17–26:2 ("You want to know who was also asking a lot of questions? Charlie Kirk was asking a lot of questions towards the end of his life, right? He was asking questions, hitting hard about Jeffrey Epstein on his show. He was exasperated at one point saying basically I've covered this, I'm upset about this. And you could sense that from high up he was being told to stop speaking about Jeffrey Epstein, and he was pushing back on that.").

to the event. Compl. ¶¶ 71–74. Owens used this supposed tip and a claim that Mr. Harpole had "lie[d] a lot" about the Kirk assassination to falsely assert that Mr. Harpole had not prepared security plans for the Charis event with campus police because he did not expect Kirk to survive September 10. *Id.*; ECF No. 31-5, 4:23–6:9. Owens' statement falsely asserted that Mr. Harpole had told many lies about the Kirk assassination, falsely implied that Mr. Harpole knew of and was responsible for the Charis event's security, and falsely claimed he possessed foreknowledge of the assassination. The Complaint's allegations specifically contradict Owens' explicit and implicit assertions: Mr. Harpole had not been advised of the Charis visit and Kirk sometimes attended events with only Dan Flood without Mr. Harpole's involvement. Compl. ¶ 73. A reasonable listener could interpret Owens' statements as implying the existence of false, undisclosed facts in support of her defamatory assertion that Mr. Harpole had foreknowledge of the Kirk assassination and allowed or intended for it to happen. The responses from Owens' audience alleged in paragraph 75 of the Complaint further demonstrate that her audience understood her statements this way.

### E. Owens' assertion that Mr. Harpole was a proven liar about the Kirk assassination and that he did not call 911 after Kirk was shot.

Owens' X post from December 12, 2025, asserted that "Brian Harpole has already been caught lying about what transpired on that day," and rhetorically asked whether he also lied about placing a 911 call after Kirk was shot. Compl. ¶ 45. Whether Mr. Harpole had been previously exposed as lying about the Kirk assassination was a verifiable assertion of fact, not a subjective opinion, and the Complaint is clear that Owens' assertions were false: Mr. Harpole did not lie about the Kirk assassination and did call 911. Compl. ¶¶ 87, 90. The Owens Defendants claim that this statement was an opinion because it was supposedly based on Owens' prior statements from her podcast a month before about drones, rooftop security arrangements, and "other matters" that

are not specified. Mot. at 15. But those prior statements were themselves false factual assertions, not opinions, s*ee supra* at II(A), and Owens' X post did not refer to them in any manner. Facially, Owens' X post stood on its own, providing no further context for her declaration that Mr. Harpole had been caught lying, and there is no reason why a reasonable audience member would think otherwise.

Because Owens paired her false claim that Mr. Harpole had already been "caught lying" with a "question" about whether he also lied about calling 911, a reasonable viewer could interpret Owens as falsely insinuating that there was a factual basis for believing Mr. Harpole lied about calling 911 after Kirk was shot.[9] Owens' X post thus could be interpreted as making the false and defamatory assertions that Mr. Harpole had repeatedly lied to the public about the Kirk assassination and contributed to Kirk's death by not calling 911 after he was shot.

### F. Owens' claim that Mr. Harpole "didn't so much as pack" Kirk's wound after he was shot.

Owens' X post from December 16, 2025, stated that Mr. Harpole "didn't so much as pack [Kirk's] wound after he was shot." Compl. ¶ 47. That is a verifiable assertion about Mr. Harpole's conduct, and the Complaint alleges it is false. Compl. ¶¶ 21, 102(f), 105–10. A reasonable viewer could understand Owens as asserting Mr. Harpole engaged in specific conduct that represented a critical failure to render aid as the professional emergency responder responsible for Kirk's safety. Contrary to the Owens Defendants' argument otherwise, the Complaint's acknowledgment that Owens described Mr. Harpole as running to Kirk with a medical bag, which she made in a podcast episode from a month earlier, does not establish the truth of her separate false accusation that he failed to use that medical bag to pack Kirk's wound. Nor does it mean that a reasonable viewer of

[9] As discussed above, "questions" can be actionable as defamatory statements when used to make false, defamatory assertions. *Grant*, No. W2015-00208-COA-R3-CV, 2015 Tenn. App. LEXIS 750, at *31.

Owens' stand-alone X post could not interpret Owens' post as accusing Mr. Harpole of contributing to Kirk's death by failing to render basic aid to him after he was shot.

**G. The Complaint sufficiently pleads defamatory implications in the alternative.**

The Owens Defendants argue that Mr. Harpole's defamation claim fails because the challenged statements present an insufficiently pleaded theory of defamation by implication. Mot. at 16–19. This misreads the Complaint. Mr. Harpole alleges defamation based on both false factual statements and false meanings conveyed by a misleading combination and omission of facts. Compl. ¶¶ 105–14. Federal Rule of Civil Procedure 8(d)(2)–(3) permits a plaintiff to plead alternative theories; a defamation claim does not fail merely because both types of defamation are pleaded.

The Complaint specifically alleges defamation by implication. Paragraph 113 of the Complaint expressly alleges that Owens cherry-picked information to create a false narrative of professional unfitness, notwithstanding her knowledge that Harpole coordinated with officials, planned security, and ran to Kirk with a medical bag. Paragraphs 105–06 likewise allege that Owens' statements were false or conveyed a false meaning and that their juxtaposition created a false, defamatory factual impression and that they were understood by Owens' audience as doing so. These are substantive allegations of defamatory implication that go beyond a mere citation to the doctrine, and Tennessee recognizes liability where materially misleading omissions or juxtaposition convey a false defamatory meaning. *Memphis Publishing Co. v. Nichols*, 569 S.W.2d 412, 419–20 (Tenn. 1978); *Grant*, No. W2015-00208-COA-R3-CV, 2015 Tenn. App. LEXIS 750, at *12–13.

The Owens Defendants claim Mr. Harpole concedes that Owens "disclosed the underlying facts" for her statements and that this nullifies the defamatory meaning her challenged statements could hold. Their claim is based on the Complaint referring generally to Owens' acknowledgement

that Mr. Harpole "coordinated with local officials, planned security, and ran over to Kirk with a medical bag after he was shot." Mot. at 16–17; Compl. ¶ 113. But the Complaint specifically alleges that Owens' statements asserted various falsehoods about his coordination with local officials, his security planning, and his medical aid to Kirk that defamatorily conveyed he was responsible for Kirk's death because he was professionally unfit or involved in the assassination. Compl. ¶¶ 31–33, 73–78, 102–14.

### III. The pleadings do not establish that Harpole is a limited-purpose public figure.

The Owens Defendants claim that Mr. Harpole must plead actual malice for his defamation claims because he is a limited-purpose public figure with respect to the controversy surrounding Kirk's assassination. They rely on Mr. Harpole's role on the security team on the day of the assassination and his two defensive interviews from November 2025 after defamatory accusations about his responsibility for the Kirk assassination had already started from Owens and others. Mot. at 20–22. Their arguments fail because the Owens Defendants confuse Mr. Harpole's "prominence" in the underlying events of the Kirk assassination with "prominence" in the debate surrounding them and mischaracterize his two interviews defending himself from reputational attacks as a voluntary attempt to influence a public controversy. Compl. ¶¶ 22–29.

The Tennessee Supreme Court explicitly rejects using an "elaborate multi-factor test[] to guide the public-figure inquiry." *Charles v. McQueen*, 693 S.W.3d 262, 275 (Tenn. 2024). Instead, the focus is on the nature and extent of the plaintiff's participation in the controversy and whether the reasons for requiring public figures to prove actual malice—voluntary exposure to increased reputational risk and effective opportunities for rebuttal—apply to the plaintiff. *Id.* (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344–45 (1974)).

The Owens Defendants' first basis for claiming Mr. Harpole is a limited-purpose public figure is that, "[a]s the founder and head of the security firm responsible for protecting Mr. Kirk

when he was killed," he "occupied a prominent role" in the events of the assassination. Mot. at 20. This improperly focuses on Mr. Harpole's importance to the underlying security operation without addressing whether he voluntarily achieved prominence in the public debate about it that followed. As both the United States and Tennessee Supreme Courts have emphasized, it is voluntary participation intended to influence the resolution of a controversy that is central to the public figure inquiry. *Charles*, 693 S.W.3d at 274–75; *Gertz*, 418 U.S. at 345.[10]

In *Wolston v. Reader's Digest Ass'n*, the Supreme Court rejected the argument that a plaintiff was a limited-purpose public figure simply because his actions attracted public interest and media scrutiny related to an espionage investigation. 443 U.S. 157, 166–68 (1979). The Court emphasized that a private individual plaintiff is not automatically transformed into a public figure by involvement in a matter attracting public attention; a defendant must show more than newsworthiness. *Id*. at 167. Similarly, the plaintiff in *Gertz* did not become a public figure by voluntarily associating himself with litigation certain to receive extensive media exposure when his participation related to representing his private client. 418 U.S. at 352. And *Khawar v. Globe International, Inc.* rejected the argument that the plaintiff's obtaining a position near Robert F. Kennedy on the podium at the time of his assassination made him a public figure for purposes of an accusation that he participated in Kennedy's assassination—that conduct preceded the

[10] While *Gertz* recognized the possibility of involuntary public figures but described such instances as exceedingly rare, 418 U.S. at 345, Mr. Harpole's pleaded security role does not establish he constitutes such an exceptional case by itself and the Owens Defendants do not suggest otherwise. Furthermore, the actual malice and public figure doctrines established by the Court in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), *Curtis Publishing Co. v. Butts*, 388 U.S. 130 (1967), and *Gertz* are historically unmoored and constitutionally infirm, as thoroughly articulated by Justice Thomas. *See McKee v. Cosby*, 586 U.S. 1172, 1179–82 (2019) (Thomas, J., concurring); *Blankenship v. NBCUniversal, LLC*, 144 S. Ct. 5, 5–6 (2023) (Thomas, J. concurring); *see also Gertz v. Robert Welch*, 418 U.S. 323, 354–380–88 (1974) (White, J., dissenting).

assassination and could not establish voluntary association with the controversy it created. 19 Cal. 4th 254, 265–67 (1998).

The authorities the Owens Defendants rely on do not suggest otherwise. *Thomas M. Cooley Law School v. Kurzon Strauss, LLP*, 759 F.3d 522, 529–31 (6th Cir. 2014), examined the plaintiff's participation in *a public debate* based on its media access and voluntary efforts to influence it. *Charles v. McQueen* likewise considered the plaintiff's voluntary, prominent role in *a public debate* over rental units. 693 S.W.3d at 276–79. The Complaint alleges that Mr. Harpole did not seek publicity or attempt to influence the ultimate resolution of the public debate about the Kirk assassination, with his only public participation in the controversy consisting of two defensive interviews limited to defending his own conduct from defamatory accusations. Compl. ¶¶ 28–29. His role on the security team is irrelevant to the question of whether he was prominent in the public debate about the assassination, and the Owens Defendants do not argue that he had any "special prominence" in influencing that debate rather than only a "trivial or tangential" role through his two isolated interviews. *Waldbaum v. Fairchild Publ'ns*, 627 F.2d 1287, 1297 (D.C. Cir. 1980).

When Mr. Harpole's two defensive interviews are considered in their pleaded context, they do not show either his "voluntary participation" in the public debate or that he held effective access to media. First, the interviews followed accusations against Mr. Harpole and the security team, including insinuations of incompetence, betrayal, and complicity in Kirk's murder. Compl. ¶¶ 22–28. Before the first interview, Owens falsely accused the security detail that Mr. Harpole personally led of leaving Kirk "sitting like a sitting duck" leading up to the assassination and of forgetting to have an ambulance ready, and described their post-shooting conduct as "shady" based on her false accusation that they tampered with the scene of the assassination by repaving it. *Id.* ¶¶ 26–27. As discussed, Mr. Harpole alleges that Owens' statements plausibly identified and

concerned him, and that Owens' audience understood her false accusations to include him. *See supra* at Section II(B). Owens' false accusations of Mr. Harpole's responsibility for and complicity in Kirk's death thus demonstrate that his two interviews were a defensive response to her defamatory statements dragging him into a public controversy against his will.

The Owens Defendants cannot "bootstrap" Mr. Harpole's public-figure status through Owens' defamatory assertions about him. *Charles*, 693 S.W.3d at 278 ("It is well settled that defendants cannot 'create their own defense' to a defamation claim 'by making the claimant a public figure.'") (quoting *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979)). To make a plaintiff a public figure, the relevant controversy and the plaintiff's relevant participation must predate the challenged publication. *Id*. Courts have extended this principle to a plaintiff's defensive response to reputational attacks made by third parties. *See Salem Media Grp., Inc. v. Awan*, 301 A.3d 633, 652 (D.C. 2023) ("Publishers cannot rely on other people's defamation to claim a change in the plaintiff's status. Nor are publishers who come along after those who first cover the same story entitled to greater protection from liability."); *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1558–63 (4th Cir. 1994) (plaintiff grandparents did not become public figures through their predominantly defensive public responses to their former daughter-in-law's accusations of child sexual abuse).[11]

[11] *See also Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 18 (1st Cir. 2011) ("We agree with *Foretich* in this limited sense: an individual should not risk being branded with an unfavorable status determination merely because he defends himself publicly against accusations, especially those of a heinous character"); *Clyburn v. News World Commc'ns*, 903 F.2d 29, 32 (D.C. Cir. 1990) ("[W]e have doubts about placing much weight on purely defensive, truthful statements made when an individual finds himself at the center of a public controversy but before any libel occurs; it is not clear why someone dragged into a controversy should be able to speak publicly only at the expense of foregoing a private person's protection from defamation."); *Time, Inc. v. Firestone*, 424 U.S. 448, 455 n.3 (1976) (plaintiff wealthy divorcee holding "a few press conferences" during her high-profile divorce proceedings "in an attempt to satisfy inquiring

Here, Mr. Harpole alleges that the interviews on November 17 and November 25, 2025, were undertaken "solely to respond to and rebut the defamatory statements" and that his participation was "limited to defending himself against statements directed at him." Compl. ¶¶ 28–29. The Owens Defendants claim that Mr. Harpole gave different explanations for the appearances during the interviews themselves, but they rely on citations to their own unverified transcripts, *see supra* at Section I(A), and even these do not contradict the defensive purpose of the interviews. The passage they cite from the Ryan interview shows Mr. Harpole and Ryan explaining that people had "sensationalized" the assassination and taken advantage of it in a way Mr. Harpole found "sickening"; that he and his team were taking "a lot of flak"; and that he was doing the interview to represent the team and answer questions about their conduct circulating online, including some Ryan described as absurd. ECF No. 31-6, 2:11–3:21. Similarly, the cited passage from the Melton interview shows Mr. Harpole explaining that his team was "being obliterated with lies," and Melton addressing the horrific accusations made against them and the need to provide balance. ECF No. 31-7, 3:4–5:20. Those explanations support, rather than refute, the defensive purpose pleaded in the Complaint.

The Owens Defendants emphasize that Mr. Harpole did not name Owens during the Ryan interview. Mot. at 21. But, as a matter of common sense, a response to defamatory accusations need not identify every person who spread them to remain defensive—particularly when the purpose of the response was to avoid further harm, not enflame controversy by publicly calling out a prominent media personality like Owens. The chronology also defeats the Owens Defendants' suggestion that both interviews preceded Owens' express identification of Mr.

---

reporters" did not constitute an attempt to thrust herself to the forefront of a public controversy and make her a limited-purpose public figure).

Harpole in her defamatory statements: the Ryan interview was November 17; Owens first named Mr. Harpole on November 18 in direct response to the Ryan interview; the Melton interview was November 25. Compl. ¶¶ 28–30; Mot. at 6 n.2, 7. During the Melton interview, Melton expressly acknowledged Owens as leading the accusations against Mr. Harpole and his team. ECF No. 31-7, 105:11–106:20. Mr. Harpole's decision to respond to Melton without providing further fuel for Owens to escalate her attacks against him is consistent with a defensive purpose and Mr. Harpole's attempt to avoid being dragged further into the controversy.

The Owens Defendants cast Mr. Harpole's participation in the interviews as going beyond self-defense because he gave his account of the security operation, addressed why the protection did not stop the assassination, identified how others were responsible for security lapses, and urged listeners to obtain public records. Mot. at 20–22. But Mr. Harpole's giving his account of the operation and how the shooting occurred is precisely what defending himself from Owens' accusations of incompetence or complicity would entail: to address accusations that he failed to provide adequate security or was involved in the assassination, he needed to explain what security was provided, how the shooting took place, and how he and his team responded. For the same reason, explaining the university police's responsibility for rooftop security was directly responsive to accusations Mr. Harpole's team was responsible for leaving those rooftops unsecured. *See* ECF No. 31-6, 43:1–46:13; ECF No. 31-7, 83:9–84:20. Mr. Harpole's suggestion that critics obtain public records rather than promote baseless conspiracy theories is also part of that defense. *See* ECF No. 31-6, 46:11–13, 97:7–17.

A reasonable response to widespread accusations need not consist solely of a bare denial. In *Foretich*, the Fourth Circuit inquired into the responsiveness and proportionality of the plaintiffs' public responses to accusations against them, finding that they were appropriately

calibrated for a defensive purpose and did not support limited-purpose public figure status. 37 F.3d at 1558–63. Here, Mr. Harpole's two isolated interviews addressing widely disseminated accusations of incompetence or complicity in Kirk's murder are proportionate to the attacks against him.

Nor do these two isolated interviews, which took place eight days apart in November 2025, establish that Mr. Harpole had the kind of "significantly greater access to the channels of effective communication" that gives public figures "a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Gertz*, 418 U.S. at 344. In *Hutchinson v. Proxmire*, the Supreme Court recognized that access to the media after an attack, for the purpose of defending one's reputation, does not itself establish public-figure status because it does not demonstrate the plaintiff's "regular and continuing access to the media that is one of the accouterments of having become a public figure." 443 U.S. at 135–36.

The Sixth Circuit has applied that distinction. In *Clark v. American Broadcasting Cos., Inc.*, the plaintiff's appearance in the challenged broadcast did not change her relative obscurity or give her effective means to contradict the impression it created. 684 F.2d 1208, 1218–19 (6th Cir. 1982). In *Wilson v. Scripps-Howard Broadcasting Co.*, the plaintiff's opportunity to respond in a news report to challenged statements likewise did not supply regular and continuing media access. 642 F.2d 371, 374 (6th Cir. 1981).

*Khawar* addressed a closely analogous circumstance: a private individual was accused of participating in Robert F. Kennedy's assassination based on his proximity to Kennedy leading up to the assassination. 19 Cal. 4th at 265–67. The California Supreme Court found that his single interview responding to an article spreading the accusation demonstrated only the type of media access likely available to a private individual subjected to sensational accusations in a widely

circulated publication. *Id*. at 266. The court recognized that treating such responsive media access as sufficient to establish public-figure status would allow publishers to turn anyone into a public figure just by making accusations. *Id*. The D.C. Court of Appeals in *Salem Media* Group likewise declined to treat defensive media participation as the kind of longstanding and widespread media access that supports public-figure status. 301 A.3d at 651–52. The Complaint alleges that Mr. Harpole was a private individual without an effective public platform, did not use his social media accounts to publish content, and engaged in only two isolated appearances to defend himself. Compl. ¶¶ 28–29. His limited, defensive media access does not represent the kind of sustained and continuing media profile that denotes a public figure.

For these reasons, the Owens Defendants have not shown that Mr. Harpole voluntarily assumed the type of prominence in a public debate and enjoyed the kind of media access necessary for him to be a limited-purpose public figure. He therefore only needs to allege negligence for his defamation claims, *Charles*, 693 S.W.3d at 269, and the Owens Defendants do not contest that he has sufficiently done so. As discussed *infra* in Section IV, Mr. Harpole nevertheless sufficiently pleads that the Owens Defendants acted with actual malice.

## IV. The Complaint plausibly alleges the Owens Defendants acted with actual malice.

Even if the Court determines that actual malice governs the challenged defamation claims, the Complaint pleads facts plausibly supporting that inference. To satisfy the actual malice standard at the pleading stage, a plaintiff need only allege facts plausibly supporting an inference that the defendant knew her statements were false or made them with a reckless disregard for the truth. *Clark v. Viacom Int'l, Inc.*, 617 F. App'x 495, 509 n.3 (6th Cir. 2015).

An allegation of actual malice may be supported by circumstantial facts consistent with such an inference.[12] This includes allegations plausibly suggesting the defendant's "purposeful avoidance of the truth"—such as refusing to investigate contradictory evidence or get a comment or confirmation from the plaintiff, a departure from journalistic standards, or possessing a profit motive for publishing the challenged statements regardless of their truth[13]—or otherwise demonstrating "a deliberate decision to not acquire knowledge of facts that might confirm the probable falsity" of defamatory statements.[14] This also includes the challenged statement being "so inherently improbable that only a reckless individual would have put it in circulation"[15] or the defendant republishing information from another despite having "obvious reasons to doubt the veracity of the informant or the accuracy of his reports."[16]

*Gilmore v. Jones*, 370 F. Supp. 3d 630, 671–78 (W.D. Va. 2019), is particularly instructive for cases involving media operations that peddle conspiracy theories for profit. There, a witness to the 2017 Charlottesville car-ramming attack alleged that the media defendants, including high-profile conspiracist Alex Jones, manufactured a role for him in a conspiracy theory about the surrounding protests and crafted their statements about him to support a preconceived narrative. *Id*. The court found that actual malice by Jones and other media defendants could be inferred based on allegations that the defendants had "'conceived a storyline about the events'" in question and then "'consciously set out to make [] false statements'" about the plaintiff to "'confirm the story's statements,'" as demonstrated by allegations that they did not first reach out to him for comment

[12] *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 668 (1989).
[13] *Id*. at 667–68 (stating that such conduct can support an inference of actual malice despite not being determinative on its own).
[14] *Id*. at 692.
[15] *Charles v. McQueen*, 693 S.W.3d 262, 281 (Tenn. 2024) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)).
[16] *St. Amant*, 390 U.S. at 732.

or confirmation, that they twisted elements of the underlying story to "fit a pre-conceived narrative," and that they had acted similarly with other national tragedies, "most notably the massacre of schoolchildren at Sandy Hook Elementary School in Newtown, Connecticut." *Id.* at 673, 677–78, 678 n.53.

The Complaint and Owens' own admitted statements provide a similar basis for plausibly inferring the Owens Defendants acted with actual malice here.

**A. Circumstantial facts support the inference that Owens made her challenged statements with actual malice.**

In line with *Harte-Hanks* and *Gilmore*, the Complaint alleges several circumstantial facts supporting an inference of actual malice by the Owens Defendants.

First, the Complaint alleges that Owens has built her business around publishing salacious and baseless stories for personal profit, including specific examples concerning her claims that French First Lady Brigitte Macron is secretly transgender, the moon landing was a conspiracy, the Holocaust was fake, and Israeli Prime Minister Benjamin Netanyahu perpetrated the September 11th terror attacks. Compl. ¶¶ 10–19. *See Harte-Hanks*, 491 U.S. at 667–68; *Gilmore*, 370 F. Supp. 3d at 673, 677–78.

Second, the Complaint alleges that Owens began making conspiratorial accusations about foul play and how Kirk was betrayed by those closest to him within a month of the assassination. Compl. ¶¶ 23–24. The Complaint alleges that there was no basis for these theories as the actual assassin, Tyler Robinson, was identified and apprehended, and there was no evidence supporting Owens' significant claims. *Id.* ¶¶ 20, 22–24. The Complaint alleges that Owens then twisted and misrepresented facts regarding Mr. Harpole and his security team in a way that fit in with her pre-conceived narrative that Kirk had been betrayed and there was a larger conspiracy behind his

assassination, including by falsely accusing them of leaving Kirk as a "sitting duck" to be killed and of tampering with the crime scene. *Id.* ¶¶ 25–27.

Third, the Complaint alleges that Owens reviewed flight records showing Mr. Harpole's presence at Fort Huachuca was impossible but nevertheless claimed the records supplied no alibi and then circulated an incident-report screenshot that did not place him at the base or establish the alleged meeting and facially had no credibility and appeared likely to have been created by Owens herself. Compl. ¶¶ 60–69, 94–95, 155. Owens' knowingly false and fabricated statements and evidence tying Mr. Harpole to the outlandish Fort Huachuca conspiracy, which she publicized with the same confidence and in the same manner as her other challenged statements about Mr. Harpole's professional unfitness and response to the assassination, support a plausible inference that Owens made her other challenged earlier statements with actual malice as part of her effort to push her pre-conceived conspiracy narrative. *See Gilmore*, 370 F. Supp. 3d at 673, 677–78; *Stern v. Cosby*, 645 F. Supp. 2d 258, 284 (S.D.N.Y. 2009) (finding that the defendant's actual malice in making conspiratorial accusations about the plaintiff's complicity in the murder of Anna Nicole Smith and her son in a book could be inferred based on the defendant making other defamatory statements in the book with actual malice).

Fourth, the Owens Defendants misstate the timing of Owens' effort to obtain Mr. Harpole's account of the Kirk assassination. They claim he concedes that Owens contacted him before publishing her challenged statements and that this "*negates* any inference of purposeful avoidance of the truth." Mot. at 24. But paragraph 54 of the Complaint alleges she made her first (dubious) offer to interview him on December 17, 2025—a full month after she started naming him directly in her defamatory accusations on November 18 and multiple days after her defamatory X posts from December 12 and 16. Furthermore, the Complaint shows her interview offer was in bad faith:

when Mr. Harpole did not respond to her "offer" within two days, she publicly claimed this was suspicious and used it to bolster her knowingly false Fort Huachuca conspiracy. Compl. ¶¶ 55, 59. Owens' refusal to obtain comment or confirmation from Mr. Harpole before launching her many false, defamatory accusations against him suggests her purposeful avoidance of the truth.[17]

**B. Owens' specific statements further support the actual malice inference.**

Owens made multiple challenged statements—i.e., that Mr. Harpole lied about drone availability and the reason why his team was not responsible for securing the rooftops, that he had "been caught lying about what transpired" on the day of the assassination, that he lied about placing a 911 call after Kirk was shot—without identifying any evidentiary basis or sources for them. Compl. ¶¶ 30–33, 45–46. This supports an inference that Owens knew her statements were false because she personally fabricated them to support her pre-conceived narrative or doubted their truthfulness because she had no basis for believing them, particularly in light of the allegation that she knowingly fabricated her claims and evidence regarding Fort Huachuca. This inference is further supported by Owens making her false assertions about rooftop security and drones in direct response to clips of Mr. Harpole's thorough explanation of these issues in the Ryan interview, which plausibly indicates she deliberately made up those claims to defend her pre-conceived narrative in the minds of her viewers. For Owens' December 12, 2025, X post in which she falsely insinuated that Mr. Harpole never called 911 after Kirk was shot, paragraph 111 of the Complaint alleges that she made her accusation despite many obvious reasons to doubt it absent further evidence, which she did not have, further supporting an inference of her actual malice.

For Owens' false claim that Mr. Harpole had foreknowledge of Kirk's murder because he was not involved in planning security for the Charis Bible College event, Compl. ¶¶ 72–75, her

[17] *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 692 (1989).

actual malice can be inferred because Owens admitted she personally worked with Mr. Harpole before[18] and was familiar with Turning Point USA's security operations[19] and thus she likely knew firsthand that Mr. Harpole was not responsible for security at every Turning Point event. Furthermore, she made this accusation in her episode from January 8, 2026, after she had already fabricated claims and evidence that Mr. Harpole was part of the Fort Huachuca conspiracy. Her assertion that Mr. Harpole did not expect Kirk to survive September 10th is thus plausibly understood as part of her effort to push her pre-conceived assassination narrative regardless of the truth. *See Gilmore*, 370 F. Supp. 3d at 673, 677–78; *Stern v. Cosby*, 645 F. Supp. 2d 258, 284 (S.D.N.Y. 2009).

Regarding Owens' claim that Mr. Harpole did not pack Kirk's wound, the Complaint alleges that Owens knew Mr. Harpole ran to Kirk with a medical bag to provide care yet falsely asserted that he did not pack the wound and selectively omitted or misrepresented known information to falsely portray him as failing to treat Kirk. Compl. ¶¶ 21, 94(h), 102(f), 105–13. Furthermore, Owens had no evidentiary basis or source for her claim and appears to have knowingly made it up herself. *Id.* Like with her Charis Bible College claims, she made this false statement after she had started promulgating her knowingly false Fort Huachuca narrative that Mr. Harpole was part of a military plot behind the Kirk assassination, supporting an inference that she made this claim as a deliberate part of her effort to push that false narrative.

For her statements that Mr. Harpole left Kirk "sitting like a sitting duck and forg[o]t to have an ambulance behind [him]," Compl. ¶ 26, her actual malice can be inferred from Owens having no evidentiary support or source for her claims that Mr. Harpole and his security team left

---

[18] ECF No. 31-4, 22:23.
[19] ECF No. 31-2, 28:18–21.

Kirk exposed at the venue without security arrangements and that there was not an ambulance at the ready due to Mr. Harpole's decision-making. Her implicit assertions that it was Mr. Harpole and his security team, rather than Kirk, Turning Point USA, and the university, who would have determined the precise location where Kirk's event was held and whether an ambulance was available are inherently improbable, *St. Amant*, 390 U.S. at 732, and her lack of evidence or support for making them suggests she fabricated them herself. This is particularly the case as she made these false assertions in support of her pre-existing false narrative that Kirk had been betrayed by those close to him and there was a conspiracy behind his assassination. *See* ECF No. 31-2, 28:12–29:6.

As demonstrated by the above-stated reasons, both general and specific, the Complaint and the Owens Defendants' own admissions about Owens' statements demonstrate a sufficiently plausible basis for inferring that Owens made her challenged statements about Mr. Harpole with actual malice.

## V. The Complaint plausibly pleads that the Owens Defendants' defamatory publications inflicted actual injury on Mr. Harpole.

The Owens Defendants argue that Mr. Harpole has not pleaded that Owens' statements caused him actual injury because the Kirk assassination supplies an obvious alternative explanation for Mr. Harpole's reputational harm. Mot. at 25–26. Though competing explanations are relevant for a claim's plausibility, the existence of another plausible, or even more likely, explanation for the plaintiff's harm does not automatically require dismissal. *16630 Southfield Ltd. Partnership v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 505–06 (6th Cir. 2013). Nor must Owens' conduct be the sole cause of injury. *See McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991). A potential loss of confidence in Mr. Harpole's services following the Kirk assassination does not preclude the Owens Defendants from causing him additional harm from false accusations that he

deliberately participated in Kirk's murder, knowingly failed to provide him emergency aid, or engaged in specific actions and omissions that contributed to his death.

Furthermore, the Complaint alleges more than an unexplained decline in reputation. It alleges lost major clients, lost business opportunities and income, damage to standing in the security industry, and emotional distress after Owens' publications. Compl. ¶¶ 79–80, 109, 115, 123. It also includes screenshots of audience responses to Owens' statements linking their belief that Mr. Harpole was responsible for Kirk's death to Owens' statements. *Id.* ¶¶ 43, 67, 75, 77, 108. These allegations plausibly connect Mr. Harpole's injuries to Owens' statements. While Tennessee requires actual injury for a defamation claim, that injury need not be a quantified out-of-pocket loss: reputational impairment, personal humiliation, and mental suffering of the kind that Mr. Harpole alleges can qualify. *Hibdon v. Grabowski*, 195 S.W.3d 48, 68 (Tenn. Ct. App. 2005). At this stage, the specific publications, responsive comments, and alleged resulting harms supply the causal connection the Owens Defendants claim is missing.

The Motion's reliance on *Poe v. Lowe*, No. 3:24-cv-00368, 2026 WL 1231217, at *9 (M.D. Tenn. May 5, 2026), does not require a different result. *Poe* addressed proof of injury on summary judgment, after discovery, not plausible allegations on a Rule 12 motion.

## VI. The Complaint's false-light claim may proceed.

The Owens Defendants argue that the false-light claim is redundant because it is duplicative of the defamation claims and fails on the merits because the Complaint does not sufficiently plead actual malice and causally connected damages. Mot. at 26–27. Neither argument warrants dismissal.

### A. Tennessee law allows for overlapping defamation and false light claims to be pleaded.

Federal Rule of Civil Procedure 8(d)(2)–(3) permits a plaintiff to plead alternative claims and theories, and the Tennessee Supreme Court has expressly allowed a plaintiff to proceed on

overlapping libel and false-light theories based on the same facts and injuries. *West v. Media General Convergence, Inc.*, 53 S.W.3d 640, 647 (Tenn. 2001); *see also Forsberg v. Knoxville Comprehensive, Breast Ctr., PLLC*, No. 3:22-CV-58-KAC-DCP, 2025 U.S. Dist. LEXIS 10256, at *7–*8 (E.D. Tenn. Jan. 21, 2025). The Owens Defendants' argument that the false light claim must be dismissed as duplicative is thus directly contradicted by applicable authority.

### B. The Complaint alleges the required fault and injury for false light.

To argue that the false light claim fails on the merits, the Owens Defendants rely entirely on the same arguments concerning actual malice and causally connected damages that they raised against the defamation claim. Mr. Harpole thus incorporates the responses already provided in Sections IV and V regarding these issues. As well, the Owens Defendants ignore that the basis for the false light claim includes the allegations concerning the Fort Huachuca conspiracy theory, and that the Complaint specifically pleads that the Owens Defendants' false-light publicity caused Mr. Harpole reputational harm, humiliation, embarrassment, anxiety, emotional distress, lost income, and lost opportunities. Compl. ¶¶ 118–124. The Owens Defendants specifically avoided challenging the allegation that they spread the Fort Huachuca story with actual malice, and they do not address the specific harms alleged for the false light claim. Their merits argument thus fails for these additional reasons as to their liability for false-light publicity based on the Fort Huachuca story.

## VII. The Complaint sufficiently pleads the civil-conspiracy and aiding-and-abetting claims.

The Owens Defendants argue that Counts V and VI fail because negligence cannot supply the required intent and knowledge for Mr. Harpole's conspiracy and aiding-and-abetting claims. Mot. at 28–29. The Complaint, however, alleges their knowing and intentional conduct in addition to negligence. Civil conspiracy requires a common design, concerted action to accomplish an unlawful purpose or a lawful purpose by unlawful means, an overt act, and resulting injury.

*Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38–39 (Tenn. Ct. App. 2006). Aiding and abetting requires knowledge of the primary actor's breach and substantial assistance or encouragement. *PNC Multifamily Capital Institutional Fund XXVI Ltd. Partnership v. Bluff City Community Development Corp.*, 387 S.W.3d 525, 552 (Tenn. Ct. App. 2012).

The Complaint directly alleges that the Owens Defendants knew Snow's defamatory Fort Huachuca story was false and deliberately coordinated with him to promote it. Compl. ¶¶ 36–37, 60–69, 127–37, 140–57. The Complaint's alternatively pleaded negligence theory does not negate these allegations that the Owens Defendants intentionally participated in a conspiracy with Snow and aided and abetted his defamatory conduct. Fed. R. Civ. P. 8(d)(2)–(3).

The Owens Defendants also argue that the conspiracy claim fails because it is conclusory, Mot. at 29, but the Complaint sufficiently alleges that the Owens Defendants conspired with Snow to defame Mr. Harpole. A conspiracy may be established based on a tacit agreement inferred from the parties' conduct, relationship, interests, and the surrounding circumstances. *Stanfill v. Hardney*, No. M2004-02768-COA-R3-CV, 2007 Tenn. App. LEXIS 620, at *25–26 (Tenn. Ct. App. Sept. 27, 2007); *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 67 (Tenn. 2001) ("'[I]t is not essential that each conspirator have knowledge of the details of the conspiracy.'") (citation omitted).

The Complaint identifies Owens' contact with Snow on December 8, 2025, Snow's permission to the Owens Defendants to broadcast his false Fort Huachuca story about Mr. Harpole, Owens' presentation of the story on December 9 as verified and explosive information about a military assassination plot, and Owens' December 18 interview with Snow eliciting Snow's asserted near-certainty that he saw Mr. Harpole at the conspiratorial military meeting the day before the Kirk assassination. Compl. ¶¶ 35–43, 127–29, 140–48. The Complaint further alleges

that Owens continued corroborating and amplifying the false story despite reviewing Mr. Harpole's flight records that contradicted it and that she promoted a false incident report as proof of her story despite it not establishing Mr. Harpole's presence as claimed. *Id.* ¶¶ 60–69, 149, 155–57. These allegations support the inference of the Owens Defendants' common purpose with Snow to knowingly defame Mr. Harpole by disseminating the false Fort Huachuca story and demonstrate overt defamatory publications in service of that purpose. The Complaint's conspiracy and aiding-and-abetting claims are thus sufficiently pleaded.

### VIII. The challenged background allegations should not be stricken under Rule 12(f).

As an afterthought, the Owens Defendants request that the Court strike Mr. Harpole's allegations concerning Owens' conspiracy theories that French First Lady Brigitte Macron is secretly transgender, that Israeli Prime Minister Benjamin Netanyahu was behind the terror attacks on September 11, 2001, and that Chabad Lubavitch is responsible for the current war on Iran and is building secret tunnels across the United States, claiming they are "immaterial and impertinent." Mot. at 27–28. Because they offer no analysis or authorities justifying their position, their request can be denied summarily. *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citation omitted). Furthermore, striking allegations is a remedy to be used sparingly,[20] and these allegations are a relevant part of the cumulative pleading supporting an inference that Owens made her challenged statements with actual malice. *See Gilmore*, 370 F. Supp. 3d at 673, 677–78; Compl. ¶¶ 16–19, 23–25, 94–95, 122.

[20] *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953).


Case 3:26-cv-00556 Document 46 Filed 11/03/26 Page 35 of 36 PageID #: 924

## CONCLUSION

For the reasons stated above, Plaintiff Brian Harpole respectfully requests that the Court deny ECF No. 31, including the partial motion to dismiss, the TPPA petition and associated fee request, and the motion to strike.

Respectfully submitted,

Matthew Seth Sarelson, Esq.
**SARELSON & SAJDERA, PLLC**
1601 Forum Place, Suite 202
West Palm Beach, Florida 33401
Tel: 305.773.1952

**CONTARINO ROTH LLC**
Jacob William Roth*
2255 Glades Road, Suite 324A
Boca Raton, FL 33431
Tel: 561.872.6508
jroth@contarinoroth.com

**THE SWAFFORD LAW FIRM, PLLC**
Tara L. Swafford, BPR # 17577
Elizabeth G. Hart, BPR # 30070
321 Billingsly Court, Suite 19
Franklin, TN 37067
Tel: (615) 599-8406
Fax: (615) 807-2355
tara@swaffordlawfirm.com
betsy@swaffordlawfirm.com

*Attorneys for Plaintiff Brian Harpole*
*Admitted pro hac vice